# O'CONNOR *v.* DONALDSON

No. 74–8.   Argued January 15, 1975—Decided June 26, 1975

*Raymond W. Gearey,* Assistant Attorney General of Florida, argued the cause for petitioner *pro hac vice.* With him on the briefs were *Robert L. Shevin,* Attorney General, and *Daniel S. Dearing,* Special Assistant Attorney General.

*Bruce J. Ennis, Jr.,* argued the cause for respondent. With him on the brief was *Morton Birnbaum.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondent, Kenneth Donaldson, was civilly committed to confinement as a mental patient in the Florida State Hospital at Chattahoochee in January 1957. He was kept in custody there against his will for nearly 15 years. The petitioner, Dr. J. B. O'Connor, was the hospital's superintendent during most of this period.

---

*William F. Hyland,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Joseph T. Maloney,* Deputy Attorney General, filed a brief for the State of New Jersey as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *E. Barrett Prettyman, Jr.,* for the American Psychiatric Assn.; by *Francis M. Shea, Ralph J. Moore, Jr., John Townsend Rich, James F. Fitzpatrick, Kurt W. Melchior, Harry J. Rubin, Sheridan L. Neimark,* and *A. L. Zwerdling* for the American Association on Mental Deficiency; and by *June Resnick German* and *Alfred Berman* for the Committee on Mental Hygiene of the New York State Bar Assn.

*William J. Brown,* Attorney General, and *Andrew J. Ruzicho* and *Barbara J. Rouse,* Assistant Attorneys General, filed a brief for the State of Ohio as *amicus curiae.*

Throughout his confinement Donaldson repeatedly, but unsuccessfully, demanded his release, claiming that he was dangerous to no one, that he was not mentally ill, and that, at any rate, the hospital was not providing treatment for his supposed illness. Finally, in February 1971, Donaldson brought this lawsuit under 42 U. S. C. § 1983, in the United States District Court for the Northern District of Florida, alleging that O'Connor, and other members of the hospital staff named as defendants, had intentionally and maliciously deprived him of his constitutional right to liberty.[1] After a four-day trial, the jury returned a verdict assessing both compensatory and punitive damages against O'Connor and a codefendant. The Court of Appeals for the Fifth Circuit affirmed the judgment, 493 F. 2d 507. We granted O'Connor's petition for certiorari, 419 U. S. 894, because of the important constitutional questions seemingly presented.

## I

Donaldson's commitment was initiated by his father, who thought that his son was suffering from "delusions." After hearings before a county judge of Pinellas County, Fla., Donaldson was found to be suffering from "paranoid schizophrenia" and was committed for "care, main-

---

[1] Donaldson's original complaint was filed as a class action on behalf of himself and all of his fellow patients in an entire department of the Florida State Hospital at Chattahoochee. In addition to a damages claim, Donaldson's complaint also asked for habeas corpus relief ordering his release, as well as the release of all members of the class. Donaldson further sought declaratory and injunctive relief requiring the hospital to provide adequate psychiatric treatment.

After Donaldson's release and after the District Court dismissed the action as a class suit, Donaldson filed an amended complaint, repeating his claim for compensatory and punitive damages. Although the amended complaint retained the prayer for declaratory and injunctive relief, that request was eliminated from the case prior to trial. See 493 F. 2d 507, 512–513.

tenance, and treatment" pursuant to Florida statutory provisions that have since been repealed.[2] The state law was less than clear in specifying the grounds necessary

[2] The judicial commitment proceedings were pursuant to § 394.22 (11) of the State Public Health Code, which provided:

"Whenever any person who has been adjudged mentally incompetent requires confinement or restraint to prevent self-injury or violence to others, the said judge shall direct that such person be forthwith delivered to a superintendent of a Florida state hospital, for the mentally ill, after admission has been authorized under regulations approved by the board of commissioners of state institutions, for care, maintenance, and treatment, as provided in sections 394.09, 394.24, 394.25, 394.26 and 394.27, or make such other disposition of him as he may be permitted by law . . . ." Fla. Laws 1955–1956 Extra. Sess., c. 31403, § 1, p. 62.

Donaldson had been adjudged "incompetent" several days earlier under § 394.22 (1), which provided for such a finding as to any person who was

"incompetent by reason of mental illness, sickness, drunkenness, excessive use of drugs, insanity, or other mental or physical condition, so that he is incapable of caring for himself or managing his property, or is likely to dissipate or lose his property or become the victim of designing persons, or inflict harm on himself or others . . . ." Fla. Gen. Laws 1955, c. 29909, § 3, p. 831.

It would appear that § 394.22 (11) (a) contemplated that involuntary commitment would be imposed only on those "incompetent" persons who "require[d] confinement or restraint to prevent self-injury or violence to others." But this is not certain, for § 394.22 (11) (c) provided that the judge could adjudicate the person a "harmless incompetent" and release him to a guardian upon a finding that he did "not require confinement or restraint to prevent self-injury or violence to others *and* that treatment in the Florida State Hospital is unnecessary or would be without benefit to such person . . . ." Fla. Gen. Laws 1955, c. 29909, § 3, p. 835 (emphasis added). In this regard, it is noteworthy that Donaldson's "Order for Delivery of Mentally Incompetent" to the Florida State Hospital provided that he required "confinement or restraint to prevent self-injury or violence to others, *or* to insure proper treatment." (Emphasis added.) At any rate, the Florida commitment statute provided no judicial procedure whereby one still incompetent could

for commitment, and the record is scanty as to Donaldson's condition at the time of the judicial hearing. These matters are, however, irrelevant, for this case involves no challenge to the initial commitment, but is focused, instead, upon the nearly 15 years of confinement that followed.

The evidence at the trial showed that the hospital staff had the power to release a patient, not dangerous to himself or others, even if he remained mentally ill and had been lawfully committed.[3] Despite many requests, O'Connor refused to allow that power to be

secure his release on the ground that he was no longer dangerous to himself or others.

Whether the Florida statute provided a "right to treatment" for involuntarily committed patients is also open to dispute. Under § 394.22 (11) (a), commitment "to prevent self-injury or violence to others" was "for care, maintenance, and treatment." Recently Florida has totally revamped its civil commitment law and now provides a statutory right to receive individual medical treatment. Fla. Stat. Ann. § 394.459 (1973).

[3] The sole *statutory* procedure for release required a judicial reinstatement of a patient's "mental competency." Public Health Code §§ 394.22 (15) and (16), Fla. Gen. Laws 1955, c. 29909, § 3, pp. 838–841. But this procedure could be initiated by the hospital staff. Indeed, it was at the staff's initiative that Donaldson was finally restored to competency, and liberty, almost immediately after O'Connor retired from the superintendency.

In addition, witnesses testified that the hospital had always had its own procedure for releasing patients—for "trial visits," "home visits," "furloughs," or "out of state discharges"—even though the patients had not been judicially restored to competency. Those conditional releases often became permanent, and the hospital merely closed its books on the patient. O'Connor did not deny at trial that he had the power to release patients; he conceded that it was his "duty" as superintendent of the hospital "to determine whether that patient having once reached the hospital was in such condition as to request that he be considered for release from the hospital."

exercised in Donaldson's case. At the trial, O'Connor indicated that he had believed that Donaldson would have been unable to make a "successful adjustment outside the institution," but could not recall the basis for that conclusion. O'Connor retired as superintendent shortly before this suit was filed. A few months thereafter, and before the trial, Donaldson secured his release and a judicial restoration of competency, with the support of the hospital staff.

The testimony at the trial demonstrated, without contradiction, that Donaldson had posed no danger to others during his long confinement, or indeed at any point in his life. O'Connor himself conceded that he had no personal or secondhand knowledge that Donaldson had ever committed a dangerous act. There was no evidence that Donaldson had ever been suicidal or been thought likely to inflict injury upon himself. One of O'Connor's codefendants acknowledged that Donaldson could have earned his own living outside the hospital. He had done so for some 14 years before his commitment, and immediately upon his release he secured a responsible job in hotel administration.

Furthermore, Donaldson's frequent requests for release had been supported by responsible persons willing to provide him any care he might need on release. In 1963, for example, a representative of Helping Hands, Inc., a halfway house for mental patients, wrote O'Connor asking him to release Donaldson to its care. The request was accompanied by a supporting letter from the Minneapolis Clinic of Psychiatry and Neurology, which a codefendant conceded was a "good clinic." O'Connor rejected the offer, replying that Donaldson could be released only to his parents. That rule was apparently of O'Connor's own making. At the time, Donaldson was 55 years old, and, as O'Connor knew, Donaldson's parents

were too elderly and infirm to take responsibility for him. Moreover, in his continuing correspondence with Donaldson's parents, O'Connor never informed them of the Helping Hands offer. In addition, on four separate occasions between 1964 and 1968, John Lembcke, a college classmate of Donaldson's and a longtime family friend, asked O'Connor to release Donaldson to his care. On each occasion O'Connor refused. The record shows that Lembcke was a serious and responsible person, who was willing and able to assume responsibility for Donaldson's welfare.

The evidence showed that Donaldson's confinement was a simple regime of enforced custodial care, not a program designed to alleviate or cure his supposed illness. Numerous witnesses, including one of O'Connor's codefendants, testified that Donaldson had received nothing but custodial care while at the hospital. O'Connor described Donaldson's treatment as "milieu therapy." But witnesses from the hospital staff conceded that, in the context of this case, "milieu therapy" was a euphemism for confinement in the "milieu" of a mental hospital.[4] For substantial periods, Donaldson was simply kept in a large room that housed 60 patients, many of whom were under criminal commitment. Donaldson's requests for ground privileges, occupational training, and an opportunity to discuss his case with O'Connor or other staff members were repeatedly denied.

At the trial, O'Connor's principal defense was that he had acted in good faith and was therefore immune from any liability for monetary damages. His position, in short, was that state law, which he had believed valid,

---

[4] There was some evidence that Donaldson, who is a Christian Scientist, on occasion refused to take medication. The trial judge instructed the jury not to award damages for any period of confinement during which Donaldson had declined treatment.

had authorized indefinite custodial confinement of the "sick," even if they were not given treatment and their release could harm no one.[5]

The trial judge instructed the members of the jury that they should find that O'Connor had violated Donaldson's constitutional right to liberty if they found that he had

> "confined [Donaldson] against his will, knowing that he was not mentally ill or dangerous or knowing that if mentally ill he was not receiving treatment for his alleged mental illness.
>
> .        .        .        .        .
>
> "Now, the purpose of involuntary hospitalization is treatment and not mere custodial care or punishment if a patient is not a danger to himself or others. Without such treatment there is no justification from a constitutional stand-point for continued confinement unless you should also find that [Donaldson] was dangerous to either himself or others." [6]

---

[5] At the close of Donaldson's case in chief, O'Connor moved for a directed verdict on the ground that state law at the time of Donaldson's confinement authorized institutionalization of the mentally ill even if they posed no danger to themselves or others. This motion was denied. At the close of all the evidence, O'Connor asked that the jury be instructed that "if defendants acted pursuant to a statute which was not declared unconstitutional at the time, they cannot be held accountable for such action." The District Court declined to give this requested instruction.

[6] The District Court defined treatment as follows:

"You are instructed that a person who is involuntarily civilly committed to a mental hospital does have a constitutional right to receive such treatment *as will give him a realistic opportunity to be cured or to improve his mental condition.*" (Emphasis added.) O'Connor argues that this statement suggests that a mental patient has a right to treatment even if confined by reason of dangerousness to himself or others. But this is to take the above paragraph out of context, for it is bracketed by paragraphs making clear the trial

The trial judge further instructed the jury that O'Connor was immune from damages if he

"reasonably believed in good faith that detention of

---

judge's theory that treatment is constitutionally required only if mental illness alone, rather than danger to self or others, is the reason for confinement. If O'Connor had thought the instructions ambiguous on this point, he could have objected to them and requested a clarification. He did not do so. We accordingly have no occasion here to decide whether persons committed on grounds of dangerousness enjoy a "right to treatment."

In pertinent part, the instructions read as follows:

"The Plaintiff claims in brief that throughout the period of his hospitalization he was not mentally ill or dangerous to himself or others, and claims further that if he was mentally ill, or if Defendants believed he was mentally ill, Defendants withheld from him the treatment necessary to improve his mental condition.

"The Defendants claim, in brief, that Plaintiff's detention was legal and proper, or if his detention was not legal and proper, it was the result of mistake, without malicious intent.

.      .      .      .      .

"In order to prove his claim under the Civil Rights Act, the burden is upon the Plaintiff in this case to establish by a preponderance of the evidence in this case the following facts:

"That the Defendants confined Plaintiff against his will, knowing that he was not mentally ill or dangerous or knowing that if mentally ill he was not receiving treatment for his alleged mental illness.

.      .      .      .      .

"[T]hat the Defendants' acts and conduct deprived the Plaintiff of his Federal Constitutional right not to be denied or deprived of his liberty without due process of law as that phrase is defined and explained in these instructions . . . .

.      .      .      .      .

"You are instructed that a person who is involuntarily civilly committed to a mental hospital does have a constitutional right to receive such treatment as will give him a realistic opportunity to be cured or to improve his mental condition.

"Now, the purpose of involuntary hospitalization is treatment and not mere custodial care or punishment if a patient is not a danger to himself or others. Without such treatment there is no justifica-

[Donaldson] was proper for the length of time he was so confined . . . .

"However, mere good intentions which do not give rise to a reasonable belief that detention is lawfully required cannot justify [Donaldson's] confinement in the Florida State Hospital."

The jury returned a verdict for Donaldson against O'Connor and a codefendant, and awarded damages of $38,500, including $10,000 in punitive damages.[7]

The Court of Appeals affirmed the judgment of the District Court in a broad opinion dealing with "the far-reaching question whether the Fourteenth Amendment guarantees a right to treatment to persons involuntarily civilly committed to state mental hospitals." 493 F. 2d, at 509. The appellate court held that when, as in Donaldson's case, the rationale for confinement is that the patient is in need of treatment, the Constitution requires that minimally adequate treatment in fact be provided. *Id.,* at 521. The court further expressed the view that, regardless of the grounds for involuntary civil commitment, a person confined against his will at a state mental institution has "a constitutional right to receive such individual treatment as will give him a reasonable opportunity to be cured or to improve his mental condition." *Id.,* at 520. Conversely, the court's opinion implied that it is constitutionally permissible for a State to confine a mentally ill person against his will in order to treat his illness, regardless of whether his illness ren-

---

tion from a constitutional stand-point for continued confinement unless you should also find that the Plaintiff was dangerous either to himself or others."

[7] The trial judge had instructed that punitive damages should be awarded only if "the act or omission of the Defendant or Defendants which proximately caused injury to the Plaintiff was maliciously or wantonly or oppressively done."

ders him dangerous to himself or others. See *id.,* at 522–527.

## II

We have concluded that the difficult issues of constitutional law dealt with by the Court of Appeals are not presented by this case in its present posture. Specifically, there is no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State, or whether the State may compulsorily confine a nondangerous, mentally ill individual for the purpose of treatment. As we view it, this case raises a single, relatively simple, but nonetheless important question concerning every man's constitutional right to liberty.

The jury found that Donaldson was neither dangerous to himself nor dangerous to others, and also found that, if mentally ill, Donaldson had not received treatment.[8] That verdict, based on abundant evidence, makes the issue before the Court a narrow one. We need not decide whether, when, or by what procedures, a mentally ill person may be confined by the State on any of the grounds which, under contemporary statutes, are generally advanced to justify involuntary confinement of such a person—to prevent injury to the public, to ensure

---

[8] Given the jury instructions, see n. 6 *supra,* it is possible that the jury went so far as to find that O'Connor knew not only that Donaldson was harmless to himself and others but also that he was not mentally ill at all. If it so found, the jury was permitted by the instructions to rule against O'Connor regardless of the nature of the "treatment" provided. If we were to construe the jury's verdict in that fashion, there would remain no substantial issue in this case: That a wholly sane and innocent person has a constitutional right not to be physically confined by the State when his freedom will pose a danger neither to himself nor to others cannot be seriously doubted.

his own survival or safety,[9] or to alleviate or cure his illness. See *Jackson* v. *Indiana,* 406 U. S. 715, 736–737; *Humphrey* v. *Cady,* 405 U. S. 504, 509. For the jury found that none of the above grounds for continued confinement was present in Donaldson's case.[10]

Given the jury's findings, what was left as justification for keeping Donaldson in continued confinement? The fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for the confinement. See *Jackson* v. *Indiana, supra,* at 720–723; *McNeil* v. *Director, Patuxent Institution,* 407 U. S. 245, 248–250. Nor is it enough that Donaldson's original confinement was

---

[9] The judge's instructions used the phrase "dangerous to himself." Of course, even if there is no foreseeable risk of self-injury or suicide, a person is literally "dangerous to himself" if for physical or other reasons he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends. While it might be argued that the judge's instructions could have been more detailed on this point, O'Connor raised no objection to them, presumably because the evidence clearly showed that Donaldson was not "dangerous to himself" however broadly that phrase might be defined.

[10] O'Connor argues that, despite the jury's verdict, the Court must assume that Donaldson was receiving treatment sufficient to justify his confinement, because the adequacy of treatment is a "nonjusticiable" question that must be left to the discretion of the psychiatric profession. That argument is unpersuasive. Where "treatment" is the sole asserted ground for depriving a person of liberty, it is plainly unacceptable to suggest that the courts are powerless to determine whether the asserted ground is present. See *Jackson* v. *Indiana,* 406 U. S. 715. Neither party objected to the jury instruction defining treatment. There is, accordingly, no occasion in this case to decide whether the provision of treatment, standing alone, can ever constitutionally justify involuntary confinement or, if it can, how much or what kind of treatment would suffice for that purpose. In its present posture this case involves not involuntary treatment but simply involuntary custodial confinement.

founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed. *Jackson* v. *Indiana, supra,* at 738; *McNeil* v. *Director, Patuxent Institution, supra.*

A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends. See *Shelton* v. *Tucker,* 364 U. S. 479, 488–490.

May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric. Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. See, *e. g., Cohen* v. *California,* 403 U. S. 15, 24–26; *Coates* v. *City of*

*Cincinnati,* 402 U. S. 611, 615; *Street* v. *New York,* 394 U. S. 576, 592; cf. *U. S. Dept. of Agriculture* v. *Moreno,* 413 U. S. 528, 534.

In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. Since the jury found, upon ample evidence, that O'Connor, as an agent of the State, knowingly did so confine Donaldson, it properly concluded that O'Connor violated Donaldson's constitutional right to freedom.

## III

O'Connor contends that in any event he should not be held personally liable for monetary damages because his decisions were made in "good faith." Specifically, O'Connor argues that he was acting pursuant to state law which, he believed, authorized confinement of the mentally ill even when their release would not compromise their safety or constitute a danger to others, and that he could not reasonably have been expected to know that the state law as he understood it was constitutionally invalid. A proposed instruction to this effect was rejected by the District Court.[11]

The District Court did instruct the jury, without objection, that monetary damages could not be assessed against O'Connor if he had believed reasonably and in good faith that Donaldson's continued confinement was

---

[11] See n. 5, *supra.* During his years of confinement, Donaldson unsuccessfully petitioned the state and federal courts for release from the Florida State Hospital on a number of occasions. None of these claims was ever resolved on its merits, and no evidentiary hearings were ever held. O'Connor has not contended that he relied on these unsuccessful court actions as an independent intervening reason for continuing Donaldson's confinement, and no instructions on this score were requested.

"proper," and that punitive damages could be awarded only if O'Connor had acted "maliciously or wantonly or oppressively." The Court of Appeals approved those instructions. But that court did not consider whether it was error for the trial judge to refuse the additional instruction concerning O'Connor's claimed reliance on state law as authorization for Donaldson's continued confinement. Further, neither the District Court nor the Court of Appeals acted with the benefit of this Court's most recent decision on the scope of the qualified immunity possessed by state officials under 42 U. S. C. § 1983. *Wood* v. *Strickland,* 420 U. S. 308.

Under that decision, the relevant question for the jury is whether O'Connor "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [Donaldson], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [Donaldson]." *Id.,* at 322. See also *Scheuer* v. *Rhodes,* 416 U. S. 232, 247–248; *Wood* v. *Strickland, supra,* at 330 (opinion of POWELL, J.). For purposes of this question, an official has, of course, no duty to anticipate unforeseeable constitutional developments. *Wood* v. *Strickland, supra,* at 322.

Accordingly, we vacate the judgment of the Court of Appeals and remand the case to enable that court to consider, in light of *Wood* v. *Strickland,* whether the District Judge's failure to instruct with regard to the effect of O'Connor's claimed reliance on state law rendered inadequate the instructions as to O'Connor's liability for compensatory and punitive damages.[12]

*It is so ordered.*

---

[12] Upon remand, the Court of Appeals is to consider only the question whether O'Connor is to be held liable for monetary damages for violating Donaldson's constitutional right to liberty. The

Mr. Chief Justice Burger, concurring.

Although I join the Court's opinion and judgment in this case, it seems to me that several factors merit more emphasis than it gives them. I therefore add the following remarks.

I

With respect to the remand to the Court of Appeals on the issue of official immunity from liability for monetary damages,[1] it seems to me not entirely irrelevant that there was substantial evidence that Donaldson consistently refused treatment that was offered to him, claiming that he was not mentally ill and needed no treatment.[2]

---

jury found, on substantial evidence and under adequate instructions, that O'Connor deprived Donaldson, who was dangerous neither to himself nor to others and was provided no treatment, of the constitutional right to liberty. Cf. n. 8, *supra*. That finding needs no further consideration. If the Court of Appeals holds that a remand to the District Court is necessary, the only issue to be determined in that court will be whether O'Connor is immune from liability for monetary damages.

Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case. See *United States* v. *Munsingwear*, 340 U. S. 36.

[1] I have difficulty understanding how the issue of immunity can be resolved on this record and hence it is very likely a new trial on this issue may be required; if that is the case I would hope these sensitive and important issues would have the benefit of more effective presentation and articulation on behalf of petitioner.

[2] The Court's reference to "milieu therapy," *ante*, at 569, may be construed as disparaging that concept. True, it is capable of being used simply to cloak official indifference, but the reality is that some mental abnormalities respond to no known treatment. Also, some mental patients respond, as do persons suffering from a variety of physiological ailments, to what is loosely called "milieu treatment," *i. e.*, keeping them comfortable, well nourished, and in a protected environment. It is not for us to say in the baffling field of psychiatry that "milieu therapy" is always a pretense.

The Court appropriately takes notice of the uncertainties of psychiatric diagnosis and therapy, and the reported cases are replete with evidence of the divergence of medical opinion in this vexing area. *E. g., Greenwood* v. *United States,* 350 U. S. 366, 375 (1956). See also *Drope* v. *Missouri,* 420 U. S. 162 (1975). Nonetheless, one of the few areas of agreement among behavioral specialists is that an uncooperative patient cannot benefit from therapy and that the first step in effective treatment is acknowledgment by the patient that he is suffering from an abnormal condition. See, *e. g.,* Katz, The Right to Treatment—An Enchanting Legal Fiction? 36 U. Chi. L. Rev. 755, 768–769 (1969). Donaldson's adamant refusal to do so should be taken into account in considering petitioner's good-faith defense.

Perhaps more important to the issue of immunity is a factor referred to only obliquely in the Court's opinion. On numerous occasions during the period of his confinement Donaldson unsuccessfully sought release in the Florida courts; indeed, the last of these proceedings was terminated only a few months prior to the bringing of this action. See 234 So. 2d 114 (1969), cert. denied, 400 U. S. 869 (1970). Whatever the reasons for the state courts' repeated denials of relief, and regardless of whether they correctly resolved the issue tendered to them, petitioner and the other members of the medical staff at Florida State Hospital would surely have been justified in considering each such judicial decision as an approval of continued confinement and an independent intervening reason for continuing Donaldson's custody. Thus, this fact is inescapably related to the issue of immunity and must be considered by the Court of Appeals on remand and, if a new trial on this issue is ordered, by the District Court.[3]

---

[3] That petitioner's counsel failed to raise this issue is not a reason

## II

As the Court points out, *ante,* at 570 n. 6, the District Court instructed the jury in part that "a person who is involuntarily civilly committed to a mental hospital does have a *constitutional* right to receive such treatment *as will give him a realistic opportunity to be cured*" (emphasis added), and the Court of Appeals unequivocally approved this phrase, standing alone, as a correct statement of the law. 493 F. 2d 507, 520 (CA5 1974). The Court's opinion plainly gives no approval to that holding and makes clear that it binds neither the parties to this case nor the courts of the Fifth Circuit. See *ante,* at 577–578, n. 12. Moreover, in light of its importance for future litigation in this area, it should be emphasized that the Court of Appeals' analysis has no basis in the decisions of this Court.

### A

There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law. *Specht* v. *Patterson,* 386 U. S. 605, 608 (1967). Cf. *In re Gault,* 387 U. S. 1, 12–13 (1967). Commitment must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist. See *McNeil* v. *Director, Patuxent Institution,* 407 U. S. 245, 249–250 (1972); *Jackson* v. *Indiana,* 406 U. S. 715, 738 (1972).

The Court of Appeals purported to be applying these principles in developing the first of its theories support-

---

why it should not be considered with respect to immunity in light of the Court's holding that the defense was preserved for appellate review.

ing a constitutional right to treatment. It first identified what it perceived to be the traditional bases for civil commitment—physical dangerousness to oneself or others, or a need for treatment—and stated:

> "[W]here, as in Donaldson's case, the rationale for confinement is the *'parens patriae'* rationale that the patient is in need of treatment, the due process clause requires that minimally adequate treatment be in fact provided. . . . 'To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process.' " 493 F. 2d, at 521.

The Court of Appeals did not explain its conclusion that the rationale for respondent's commitment was that he needed treatment. The Florida statutes in effect during the period of his confinement did not require that a person who had been adjudicated incompetent and ordered committed either be provided with psychiatric treatment or released, and there was no such condition in respondent's order of commitment. Cf. *Rouse* v. *Cameron,* 125 U. S. App. D. C. 366, 373 F. 2d 451 (1967). More important, the instructions which the Court of Appeals read as establishing an absolute constitutional right to treatment did not require the jury to make any findings regarding the specific reasons for respondent's confinement or to focus upon any rights he may have had under state law. Thus, the premise of the Court of Appeals' first theory must have been that, at least with respect to persons who are not physically dangerous, a State has no power to confine the mentally ill except for the purpose of providing them with treatment.

That proposition is surely not descriptive of the power traditionally exercised by the States in this area.

Historically, and for a considerable period of time, subsidized custodial care in private foster homes or boarding houses was the most benign form of care provided incompetent or mentally ill persons for whom the States assumed responsibility. Until well into the 19th century the vast majority of such persons were simply restrained in poorhouses, almshouses, or jails. See A. Deutsch, The Mentally Ill in America 38–54, 114–131 (2d ed. 1949). The few States that established institutions for the mentally ill during this early period were concerned primarily with providing a more humane place of confinement and only secondarily with "curing" the persons sent there. See *id.*, at 98–113.

As the trend toward state care of the mentally ill expanded, eventually leading to the present statutory schemes for protecting such persons, the dual functions of institutionalization continued to be recognized. While one of the goals of this movement was to provide medical treatment to those who could benefit from it, it was acknowledged that this could not be done in all cases and that there was a large range of mental illness for which no known "cure" existed. In time, providing places for the custodial confinement of the so-called "dependent insane" again emerged as the major goal of the States' programs in this area and remained so well into this century. See *id.*, at 228–271; D. Rothman, The Discovery of the Asylum 264–295 (1971).

In short, the idea that States may not confine the mentally ill except for the purpose of providing them with treatment is of very recent origin,[4] and there is no historical basis for imposing such a limitation on state power. Analysis of the sources of the civil commitment power likewise lends no support to that notion. There can be little doubt that in the exercise of its police power

---

[4] See Editorial, A New Right, 46 A. B. A. J. 516 (1960).

a State may confine individuals solely to protect society from the dangers of significant antisocial acts or communicable disease. Cf. *Minnesota ex rel. Pearson* v. *Probate Court,* 309 U. S. 270 (1940); *Jacobson* v. *Massachusetts,* 197 U. S. 11, 25–29 (1905). Additionally, the States are vested with the historic *parens patriae* power, including the duty to protect "persons under legal disabilities to act for themselves." *Hawaii* v. *Standard Oil Co.,* 405 U. S. 251, 257 (1972). See also *Mormon Church* v. *United States,* 136 U. S. 1, 56–58 (1890). The classic example of this role is when a State undertakes to act as " 'the general guardian of all infants, idiots, and lunatics.' " *Hawaii* v. *Standard Oil Co., supra,* at 257, quoting 3 W. Blackstone, Commentaries \*47.

Of course, an inevitable consequence of exercising the *parens patriae* power is that the ward's personal freedom will be substantially restrained, whether a guardian is appointed to control his property, he is placed in the custody of a private third party, or committed to an institution. Thus, however the power is implemented, due process requires that it not be invoked indiscriminately. At a minimum, a particular scheme for protection of the mentally ill must rest upon a legislative determination that it is compatible with the best interests of the affected class and that its members are unable to act for themselves. Cf. *Mormon Church* v. *United States, supra.* Moreover, the use of alternative forms of protection may be motivated by different considerations, and the justifications for one may not be invoked to rationalize another. Cf. *Jackson* v. *Indiana,* 406 U. S., at 737–738. See also American Bar Foundation, The Mentally Disabled and the Law 254–255 (S. Brakel & R. Rock ed. 1971).

However, the existence of some due process limitations on the *parens patriae* power does not justify the further conclusion that it may be exercised to confine a mentally

ill person only if the purpose of the confinement is treatment. Despite many recent advances in medical knowledge, it remains a stubborn fact that there are many forms of mental illness which are not understood, some which are untreatable in the sense that no effective therapy has yet been discovered for them, and that rates of "cure" are generally low. See Schwitzgebel, The Right to Effective Mental Treatment, 62 Calif. L. Rev. 936, 941–948 (1974). There can be little responsible debate regarding "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." *Greenwood* v. *United States,* 350 U. S., at 375. See also Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif. L. Rev. 693, 697–719 (1974).[5] Similarly, as previously observed, it is universally recognized as fundamental to effective therapy that the patient acknowledge his illness and cooperate with those attempting to give treatment; yet the failure of a large proportion of mentally ill persons to do so is a common phenomenon. See Katz, *supra,* 36 U. Chi. L. Rev., at 768–769. It may be that some persons in either of these categories,[6] and there may be others, are unable to function in society and will suffer real harm to themselves unless provided with care in a sheltered environment. See, *e. g., Lake* v. *Cameron,* 124 U. S. App. D. C.

---

[5] Indeed, there is considerable debate concerning the threshold questions of what constitutes "mental disease" and "treatment." See Szasz, The Right to Health, 57 Geo. L. J. 734 (1969).

[6] Indeed, respondent may have shared both of these characteristics. His illness, paranoid schizophrenia, is notoriously unsusceptible to treatment, see Livermore, Malmquist, & Meehl, On the Justifications for Civil Commitment, 117 U. Pa. L. Rev. 75, 93, and n. 52 (1968), and the reports of the Florida State Hospital staff which were introduced into evidence expressed the view that he was unwilling to acknowledge his illness and was generally uncooperative.

264, 270–271, 364 F. 2d 657, 663–664 (1966) (dissenting opinion). At the very least, I am not able to say that a state legislature is powerless to make that kind of judgment. See *Greenwood* v. *United States, supra.*

## B

Alternatively, it has been argued that a Fourteenth Amendment right to treatment for involuntarily confined mental patients derives from the fact that many of the safeguards of the criminal process are not present in civil commitment. The Court of Appeals described this theory as follows:

> "[A] due process right to treatment is based on the principle that when the three central limitations on the government's power to detain—that detention be in retribution for a specific offense; that it be limited to a fixed term; and that it be permitted after a proceeding where the fundamental procedural safeguards are observed—are absent, there must be a *quid pro quo* extended by the government to justify confinement. And the *quid pro quo* most commonly recognized is the provision of rehabilitative treatment." 493 F. 2d, at 522.

To the extent that this theory may be read to permit a State to confine an individual simply because it is willing to provide treatment, regardless of the subject's ability to function in society, it raises the gravest of constitutional problems, and I have no doubt the Court of Appeals would agree on this score. As a justification for a constitutional right to such treatment, the *quid pro quo* theory suffers from equally serious defects.

It is too well established to require extended discussion that due process is not an inflexible concept. Rather, its requirements are determined in particular instances by identifying and accommodating the inter-

ests of the individual and society. See, *e. g., Morrissey* v. *Brewer,* 408 U. S. 471, 480–484 (1972); *McNeil* v. *Director, Patuxent Institution,* 407 U. S., at 249–250; *McKeiver* v. *Pennsylvania,* 403 U. S. 528, 545–555 (1971) (plurality opinion). Where claims that the State is acting in the best interests of an individual are said to justify reduced procedural and substantive safeguards, this Court's decisions require that they be "candidly appraised." *In re Gault,* 387 U. S., at 21, 27–29. However, in so doing judges are not free to read their private notions of public policy or public health into the Constitution. *Olsen* v. *Nebraska,* 313 U. S. 236, 246–247 (1941).

The *quid pro quo* theory is a sharp departure from, and cannot coexist with, due process principles. As an initial matter, the theory presupposes that essentially the same interests are involved in every situation where a State seeks to confine an individual; that assumption, however, is incorrect. It is elementary that the justification for the criminal process and the unique deprivation of liberty which it can impose requires that it be invoked only for commission of a specific offense prohibited by legislative enactment. See *Powell* v. *Texas,* 392 U. S. 514, 541–544 (1968) (opinion of Black, J.).[7] But it would be incongruous, for example, to apply the same limitation when quarantine is imposed by the State to protect the public from a highly communicable disease. See *Jacobson* v. *Massachusetts,* 197 U. S., at 29–30.

---

[7] This is not to imply that I accept all of the Court of Appeals' conclusions regarding the limitations upon the States' power to detain persons who commit crimes. For example, the notion that confinement must be "for a fixed term" is difficult to square with the widespread practice of indeterminate sentencing, at least where the upper limit is a life sentence.

A more troublesome feature of the *quid pro quo* theory is that it would elevate a concern for essentially procedural safeguards into a new substantive constitutional right.[8] Rather than inquiring whether strict standards of proof or periodic redetermination of a patient's condition are required in civil confinement, the theory accepts the absence of such safeguards but insists that the State provide benefits which, in the view of a court, are adequate "compensation" for confinement. In light of the wide divergence of medical opinion regarding the diagnosis of and proper therapy for mental abnormalities, that prospect is especially troubling in this area and cannot be squared with the principle that "courts may not substitute for the judgments of legislators their own understanding of the public welfare, but must instead concern themselves with the validity under the Constitution of the methods which the legislature has selected." *In re Gault,* 387 U. S., at 71 (Harlan, J., concurring and dissenting). Of course, questions regarding the adequacy of procedure and the power of a State to continue particular confinements are ultimately for the courts, aided by expert opinion to the extent that is found helpful. But I am not persuaded that we should abandon the traditional limitations on the scope of judicial review.

## C

In sum, I cannot accept the reasoning of the Court of Appeals and can discern no basis for equating an involuntarily committed mental patient's unquestioned constitutional right not to be confined without due proc-

---

[8] Even advocates of a right to treatment have criticized the *quid pro quo* theory on this ground. *E. g.,* Developments in the Law— Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1325 n. 39 (1974).

ess of law with a constitutional right to *treatment*.[9] Given the present state of medical knowledge regarding abnormal human behavior and its treatment, few things would be more fraught with peril than to irrevocably condition a State's power to protect the mentally ill upon the providing of "such treatment as will give [them] a

---

[9] It should be pointed out that several issues which the Court has touched upon in other contexts are not involved here. As the Court's opinion makes plain, this is not a case of a person's seeking release because he has been confined "without ever obtaining a judicial determination that such confinement is warranted." *McNeil* v. *Director, Patuxent Institution*, 407 U. S. 245, 249 (1972). Although respondent's amended complaint alleged that his 1956 hearing before the Pinellas County Court was procedurally defective and ignored various factors relating to the necessity for commitment, the persons to whom those allegations applied were either not served with process or dismissed by the District Court prior to trial. Respondent has not sought review of the latter rulings, and this case does not involve the rights of a person in an initial competency or commitment proceeding. Cf. *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972); *Specht* v. *Patterson*, 386 U. S. 605 (1967); *Minnesota ex rel. Pearson* v. *Probate Court*, 309 U. S. 270 (1940).

Further, it was not alleged that respondent was singled out for discriminatory treatment by the staff of Florida State Hospital or that patients at that institution were denied privileges generally available to other persons under commitment in Florida. Thus, the question whether different bases for commitment justify differences in conditions of confinement is not involved in this litigation. Cf. *Jackson* v. *Indiana, supra*, at 723–730; *Baxstrom* v. *Herold*, 383 U. S. 107 (1966).

Finally, there was no evidence whatever that respondent was abused or mistreated at Florida State Hospital or that the failure to provide him with treatment aggravated his condition. There was testimony regarding the general quality of life at the hospital, but the jury was not asked to consider whether respondent's confinement was in effect "punishment" for being mentally ill. The record provides no basis for concluding, therefore, that respondent was denied rights secured by the Eighth and Fourteenth Amendments. Cf. *Robinson* v. *California*, 370 U. S. 660 (1962).

realistic opportunity to be cured." Nor can I accept the theory that a State may lawfully confine an individual thought to need treatment and justify that deprivation of liberty solely by providing some treatment. Our concepts of due process would not tolerate such a "trade-off." Because the Court of Appeals' analysis could be read as authorizing those results, it should not be followed.