HIGHTOWER, Judge,
dissenting
I.
My initial disagreement with the majority disposition arises on constitutional grounds. Stated directly, under present circumstances, the judicial commitment case should never have been referred to a panel of five judges.
Concerning review by three-judge courts of appeal panels, LSA-Const. Art. 5, § 8(B) states:
(B) Judgments. A majority of the judges sitting in a case must concur to render judgment. However, in civil matters only, when a judgment of a district court is to be modified or reversed and one judge dissents, the case shall be rear-gued before a panel of at least five judges prior to rendition of judgment, and a majority must concur to render judgment.
The commitment and interdiction actions at hand clearly began as two separate proceedings. Notwithstanding plaintiff’s later motion to consolidate “for purposes of considering the motions for new trial,” and despite reference to consolidation in the preamble of the December 28, 1990 judgments and also in certain denials of new trial, the record fails to disclose any order directing consolidation by the trial court. Moreover, in dissenting from an October 24, 1991 circuit court consolidation after submission of the cases for decision, I observed that when two members of the three-judge appellate panel favored affirmance — as the situation then existed concerning the judicial commitment determination — the district court disposition constitutionally should prevail with respect to that judgment alone. Subsequently based on a lack of unanimity concerning modification of the interdiction, both consolidated cases came before a five-judge panel. There, the majority has now reversed the judicial commitment favored by two members of the original three-judge court.
In my humble opinion, the result offends LSA-Const. Art. 5, § 8. But for the consolidation of the two cases, an opinion concerning the judicial commitment of F.T.E. would have been separately rendered to affirm the district court’s judgment. For that reason, the majority’s present elaborations on the matter are particularly regrettable.
Furthermore, anent the propriety of consolidating cases sua sponte, this court does not have such authority in my view, irrespective of any seeming attractiveness in this or other cases. Neither the Code of Civil Procedure nor the Uniform Rules of Louisiana Courts of Appeal set forth that option. Indeed, LSA-C.C.P. Art. 1561 appears to allow a trial judge to consolidate only preceding actual commencement of trial.
Rendition of companion opinions by the reviewing tribunal, when issues of law or fact are truly common in two or more separate suits on appeal, may well be appropriate. However, such an approach should scrupulously observe the constitutional integrity of each judgment.
II.
Upon addressing the merits, I again cannot concur with the majority. Contrary to their conclusions, the present record clearly and convincingly supports the judicial commitment rendered by the district judge.
Before one may be subjected to a judgment of civil commitment, the petitioner must show by clear and convincing proof that the respondent is dangerous to himself or to others or is gravely disabled, as a result of mental illness. LSA-R.S. 28:55 E; State, in the Matter of B. W, 566 So.2d 1094 (La.App. 2d Cir.1990); Matter of A. C., supra; Judicial Commitment of J.M., su *489 pra. See also Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), concerning federal constitutional guarantees. Thus, evidence at a commitment proceeding must establish at least one of the three statutory justifications for institutionalization. Matter of A.C., supra.
The majority accepts appellant’s argument, that his disability resulted as a consequence of multiple sclerosis, not mental illness, and that LSA-R.S. 28:1, et seq., thus do not apply. I disagree. The trial court, after directly considering this precise issue, found the patient gravely disabled due to then-existing mental illness.
A “gravely disabled” person is one “who is unable to provide for his own basic physical needs, such as essential food, clothing, medical care, and shelter, as a result of serious mental illness or substance abuse and is unable to survive safely in freedom or protect himself from serious harm; ...” LSA-R.S. 28:2(10). The statutory provisions, although failing to define mental illness, describe a “mentally ill person” as “any person with a psychiatric disorder which has substantial adverse effects on his ability to function and who requires care and treatment.” LSA-R.S. 28:2(14).
Both Dr. Robinson and Dr. Schober, board certified psychiatrists, determined F.T.E. to be gravely disabled, lacking the judgmental capacity to decide about his own health care. While not attempting to evaluate mental status, Dr. Reilly, the treating geriatric physician at the nursing home, also opined that appellant did not have the ability to decide whether to take medicine, or to recognize what is good or bad in the long term. Dr. Robinson, who evaluated the patient on several occasions, explained that the multiple sclerosis condition had affected parts of the brain that control judgment, insight, and reasoning ability. He presented a diagnosis of dementia, a mental disorder in which one loses certain faculties dealing with reality, including the ability to maintain personal hygiene and properly use medication, clothing, shelter, and such items.
In Dr. Robinson’s expressly stated opinion, F.T.E. suffers a mental illness by which he is gravely disabled. Furthermore, the doctor testified that the disorder presently requires involuntary confinement and treatment.
During a new trial considering the issue of least restrictive placement, both Drs. Robinson and Reilly stated that appellant should remain in the nursing facility. The psychiatrist observed that to return the patient home would create a high likelihood of physical harm. Other evidence, including testimony by Hoyt Tompkins, a long time friend, and Francis Fulgium, a sitter in the home for approximately six years, corroborated F.T.E.’s volatile mood swings and irrational behavior patterns, symptoms suggested by the expert opinions.
Considering the statutory provisions, and utilizing a level-headed approach, the record clearly and convincingly reflects respondent suffered a mental illness that rendered him gravely disabled at the time of the judicial commitment hearings, irrespective of the factor precipitating that psychiatric disorder. Cf. Matter of L.M.S., supra, where the disability resulted from the physical incapacities of an arthritic condition, rather than from a mental illness. Indeed, contrary to the majority, I find myself unable to regard F.T.E.’s mental illness as a nonserious “mild” personality disorder.
In my view, the judicial commitment proceedings also establish another reason for institutionalization. As indicated above, according to expert testimony, F.T.E.’s delusions concerning his medical condition create a high likelihood of physical and emotional harm. Hence, as stated by Dr. Robinson, a significant “danger to self” risk exists. See LSA-R.S. 28:55 E and 28:2(4); Matter of A.C., supra. Both Mrs. Fulgium and another sitter, Mary Johnson, testified that appellant often refused to cooperate concerning his health care and hygiene, dictated exactly what medications he would take, and exercised aggressive behavior toward his care providers. Further shown are references to the total lack of medical attention for almost four years preceding issuance of the emergency certificate. The *490 record, then, on additional grounds, supports commitment.
Similarly, I disagree with statements in the majority opinion suggesting that the ordered nursing home placement is inappropriate under the circumstances. True enough, statutory and constitutional safeguards mandate a “least restrictive” confinement. LSA-R.S. 28:55 E; O’Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Matter of L.M.S., supra. However, the nature of respondent’s disease, his unreliable self-care record, and the uncertainty that he would accept treatment and take medications on an out-patient or at-home basis, demonstrate the correctness of the trial judge’s determination. As noted previously, both Drs. Robinson and Reilly testified that their patient should remain at the nursing facility. Notwithstanding the possibility of home health care, the district court found that environment not medically suitable to the needs shown, even after a new trial on the issue. And following repeated review of the record, I fail to discern any error in that determination.
Clearly, then, the trial court’s well-founded judgment of judicial commitment, and corresponding confinement to Nursecare, should have been affirmed.
III.
Turning to the interdiction action, hearings in that matter commenced almost two months after conclusion of the commitment trial. Save for defendant testifying in his own behalf, the evidence closely paralleled that taken in the earlier proceeding. Based on that record, demonstrated mental and physical infirmities plainly prevent F.T.E. from caring for his person. Indeed, the majority concedes that fact. As in the past, his health care needs must be totally provided by others. Of greater importance, however, incidents occurring while defendant previously provided supervision of his own care reflected a substantial risk to his physical well-being, if he again secured such authority. Also, for the reasons discussed earlier, the more secured environment of the designated nursing center is clearly a more appropriate facility for F.T.E.’s continued care than his home, which the trial court deemed unsuitable after careful consideration.
Nonetheless, I agree with the majority that defendant’s testimony during these proceedings, combined with other disclosures, fails to clearly and convincingly indicate an inability to administer his estate.[1] See LSA-C.C. Arts. 389, 422; Matter of Fabre, supra; Interdiction of Dobbins, supra; Interdiction of Denham, 554 So.2d 836 (La.App. 1st Cir.1989), writ denied, 558 So.2d 587 (La.1990); Interdiction ofBada-lamenti, supra; Interdiction of Lem-mons, supra. See also In re Ohanna, supra; Interdiction of White, 463 So.2d 53 (La.App. 3d Cir.1985), indicating the petitioner bears the burden of establishing, by clear and conclusive proof, his claim that the defendant is subject to interdiction.
Conceptually, then, existing circumstances could warrant modification of the pronouncement of total interdiction into a limited interdiction over F.T.E.’s person. See LSA-C.C. Art. 389.1; Interdiction of Dobbins, supra; Interdiction ofBadalam-enti, supra; Interdiction of Goldsmith, supra. However, in granting total interdiction, the trial court did not have an opportunity to consider the practical effects of any limited interdiction, and to fashion suitable measures should such a judgment be found appropriate. Thus, inasmuch as a substantial period of time has now lapsed since the previous determination, and recognizing that the record indicates appellant’s illness to be progressive in nature, I would modify the judgment of total interdiction into a temporary decree that would continue to control while the district court expeditiously pursued the directives of a remand. It is important to observe the effect of such a course of action, as distinguished from the majority’s *491 immediate reversal of total interdiction and simultaneous rendition of a limited interdiction, all after broadly disregarding the trial court’s evaluation of day-to-day care needs.
Another aspect of today’s ruling bears consideration. Although previously concluding that F.T.E.’s infirmity results from a “physical malady,” the majority nevertheless orders a determination as to whether progression of that disease has substantially deteriorated his financial managerial capacities, which, as also said by the majority, hinge upon mental abilities. Such rationale, from my perspective, appears questionable.
Furthermore, certain language by the majority suggests that “limited-limited” or hybrid interdictions are viable per LSA-C.C. Art. 389.1. However, in my view, as expressed in concurrence to Matter of Heard, supra, that Article essentially seeks to provide for interdictions limited to the person or the estate.
Finally, with respect to the interdiction judgment, I would maintain the appointment of Francis Fulgium as curator. The trial judge has wide discretion to act in the best interest of the interdict in appointing a curator, as acknowledged by the majority. In Re Swett, supra; Interdiction of Von Schneidau, 560 So.2d 942 (La.App. 1st Cir. 1990), writ denied, 567 So.2d 612 (La.1990); Interdiction of Thomas, 535 So.2d 1315 (La.App. 5th Cir.1988). Here, the record indicates a longtime association between F.T.E. and the curator appointed. Indeed, this individual assisted in the management of defendant’s affairs and helped in his care for some six years preceding initiation of the instant proceedings. Irrespective of any “personality conflicts,” the district judge’s appointment falls squarely within the bounds of deference accorded the trial court.
CONCLUSION
Simply stated, I find no error in the trial court’s determinations, save for interdiction over financial matters. And, on that issue, even the majority would remand for an additional evidentiary hearing. With that approach in mind, I would logically modify the interdiction judgment into a temporary decree pending further review on remand. Of course, as previously indicated, I would affirm the judgment of civil commitment.
I respectfully dissent.
APPLICATION FOR REHEARING
Before MARVIN, NORRIS, LINDSAY, HIGHTOWER and BROWN, JJ.
Rehearing denied.

. Appellee asserts that the nature of the presented disease subjects defendant’s mental capacities to intervals of exacerbations and remissions. Indeed, some of the testimony is consistent with that proposition. However, without more evidence on the subject, I cannot say the present record clearly and convincingly proves incapacity to handle business affairs.