37 So.3d 576 (2010)
In the Matter of T.B.
No. 45,380-CA.
Court of Appeal of Louisiana, Second Circuit.
May 19, 2010.
*577 Mental Health Advocacy Service by Sangbahn Y. Scere for Appellant.
Michelle Dufour Brown, for Appellee.
Before BROWN, PEATROSS and MOORE, JJ.
MOORE, J.
The Louisiana State University Health Sciences Center (LSUHSC) filed a petition for judicial commitment of T.B. to a treatment facility on November 20, 2009. The matter came up for hearing by rule on December 2, 2009. Based upon the testimony of T.B. and Dr. Mary Jo Fitz-Gerald, the court found that T.B. is gravely disabled and a danger to herself. The court ordered T.B. committed to the least restrictive facility available for long-term treatment until she is discharged, conditionally discharged or until discharged by the court for a period up to 180 days, unless T.B. is converted to voluntary status, or LSUHSC files a new petition for judicial commitment prior to expiration of the commitment period. T.B. filed an appeal seeking immediate discharge.

FACTS
The matters of record show that T.B. is 33 years old and a resident of Texas, although there is some question whether her home is in Dallas or Lone Star.
T.B. appeared at the U.S. Marshal's office in the United States Court House building ("courthouse") in downtown Shreveport on November 5, 2009. It was reported that she made threats about hurting herself and others. In her own words, she came to Shreveport to deliver some paperwork she brought over from Texas, detailing how the State of Texas had deprived her of her liberty, justice, and equal protection under the law, by making false charges against her and making false statements. There is also some indication that she reported to an Officer Lynch from the U.S. Marshal's office that the CIA was responsible for her problems.
T.B. was taken to LSUHSC where she has remained under hospital confinement from that time until the present. She was examined on November 24, 2009 by Mary Jo Fitz-Gerald, M.D., a psychiatrist who assessed her mental condition. Dr. Fitz-Gerald's findings indicate that T.B. initially began talking to her, but she refused to answer any questions, and she left the interview before it was completed. According to the report, much of the information about her came from her chart, which indicated that the patient's mother was contacted, and the mother reported that T.B. left Dallas, Texas, abruptly with her youngest child, a five-year old, and went to *578 Dangerfield, Texas, where she has an aunt. The report said that T.B. told her aunt that the FBI was chasing her. T.B. went on to Lone Star, Texas, where she has an uncle. She exhibited the same behavior there before coming to Shreveport. Although she has six children, she has custody of only one-three are in their fathers' custody and two are in a grandmother's custody. T.B. has no official or unofficial medical history of psychiatric problems. She tested clear for drugs.
At the judicial commitment proceeding, T.B. stated that she did not know how she came to be in Shreveport, but that she had been in the city one day when she went to the courthouse. She denied any previous diagnosis of mental illness or hospitalization for mental problems. She claimed she was an OTR ("over-the-road") truck driver who last worked in January of 2008.
On direct examination, T.B. presented herself as being cooperative and compliant, and essentially not in need of confinement for treatment of her depression. T.B. promised that if she were released, she would return to 645 New Haven Street, Lone Star, Texas, and she would take the medications prescribed by Dr. Fitz-Gerald. She said that she did not believe the CIA was interfering in her life, but she refused to answer when she was asked if she had previously made comments to that effect. Then she stated that she made comments about the FBI, namely, that she needed to bring the documents to the FBI here because they would not take them in Texas.
T.B. denied that she had ever made any threats to harm herself or others. She insisted that she had attended all meetings, interviews, group sessions and so on at the hospital. She said that her brother would pick her up from the hospital and take her back to Lone Star.
On cross-examination, T.B. denied that she walked out of an interview with Dr. Fitz-Gerald in preparation for the court hearing and insisted that Dr. Fitz-Gerald told her that she (the doctor) was recommending that she be discharged to her brother. T.B. stated that Dr. Fitz-Gerald's statements in her report that she had been non-compliant with her medication and uncooperative during interviews were false.
Dr. Fitz-Gerald reported that T.B. initially refused to take all medications, so she was given the drug Zyprexa involuntarily and oral Geodon. She complained that the Zyprexa made her nauseous, so Lithium Carbonate was substituted; however, she is not taking it because she claims it makes her nauseous as well. She is taking the Geodon.
Dr. Fitz-Gerald believes that T.B. will not continue to take her medicines if released, although she believes T.B. has improved. Dr. Fitz-Gerald indicated that she was concerned that T.B. wears caps every day and apparently pushes her hair up under the cap. She said she had no reason to believe that Ms. Berry did not bathe, but speculated that she might be ashamed of her hair. The doctor said that T.B. appeared to be in good health.
Dr. Fitz-Gerald stated that she believed that T.B. suffered from mental illness and posed a danger to herself and others, and is therefore gravely disabled. This appears to be largely based on her view that T.B. refused to answer some questions and that she will not continue to take her medications if released, nor will she obtain outpatient care. Regarding the question of whether she would harm herself, Dr. Fitz-Gerald was concerned that she might put herself in harmful situations and not take care of herself. She believed that the same might occur with respect to her child or children. Finally, she said that it is *579 significantly likely that she could not provide herself with food, clothing, shelter and medical care.
Dr. Fitz-Gerald admitted that her conclusions were largely based on second-hand and third-hand information, such as the information in the chart that was obtained from the patient's mother. She had not spoken to Child Protective Services regarding the condition of T.B.'s child. She also admitted that T.B. appeared to be healthy and that the drug screen was clear. The doctor admitted that she personally had not spoken with any of T.B.'s relatives, and she did not know if they were willing to let her live with them.
All in all, it appears that Dr. Fitz-Gerald's conclusions are based largely on T.B.'s lack of cooperation and refusal to answer many of the questions that she posed to her. She repeatedly stated that she thought T.B. was getting better, and she said that she would probably be released in the near future. However, with so many unanswered questions and T.B.'s resistance to drug treatment, Dr. Fitz-Gerald believes that she is a danger to herself and others, in that Dr. Fitz-Gerald does not believe T.B. can take care of herself and the child.
The court concluded that T.B. was gravely disabled and dangerous to herself. She said that T.B.'s testimony was self-serving and designed to get herself released. She said that she observed that T.B. delayed answering some questions. She said that T.B. had been uncooperative at the hospital and that her behavior in going to the courthouse was alarming and dangerous to other people and evidence of an acute episode of something.
The court acknowledged that there had been no determination of what was wrong with T.B., which she attributed to T.B.'s lack of cooperation, but concluded from T.B.'s demeanor in the courtroom that "she is suffering from delusions, psychosis, and she needs to stay here longer."
T.B.'s counsel filed this appeal raising two assignments of error:
(1) The trial judge found T.B. to be gravely disabled due to mental illness absent clear and convincing evidence.
(2) The trial judge found T.B. to be a danger to herself absent clear and convincing evidence.

DISCUSSION
Generally, appellate courts must give great weight to factual findings by the trial court. However, in cases where a person is deprived of liberty by involuntary commitment, the evidence must be reviewed for strict adherence to the high standard of proof required by constitutional and statutory law. In the Matter of M.M., 552 So.2d 528 (La.App. 2 Cir.1989).
Judicial commitment of a mentally ill person is a civil exercise of the state's police power. It is not a criminal proceeding or a formal interdiction affecting the committed person's property rights. Before a person may be subjected to a judgment of civil commitment, the petitioner must establish by clear and convincing proof that the person is a danger to himself or others or is gravely disabled by substance abuse or mental illness. In the Matter of M.M., supra. "Clear and convincing" evidence is more than a "preponderance" of evidence but less than "proof beyond a reasonable doubt." In the Matter of B.W., 566 So.2d 1094 (La.App. 2 Cir.1990). Under this "clear and convincing" standard, the existence of the disputed fact must be highly probable, or much more probable than not. In the Matter of L.M.S., 476 So.2d 934 (La.App. 2 Cir.1985).
*580 La. R.S. 28:55(E)(1) directs a trial court to make the following evaluation in a judicial commitment proceeding:
If the court finds by clear and convincing evidence that the respondent is dangerous to self or others or is gravely disabled, as a result of substance abuse or mental illness, it shall render a judgment for his commitment. After considering all relevant circumstances, including any preference of the respondent or his family, the court shall determine whether the respondent should be committed to a treatment facility which is medically suitable and least restrictive of the respondent's liberty. However, if the placement determined by the court is unavailable, the court shall commit the respondent to the Department of Health and Hospitals for placement in a state treatment facility until such time as an opening is available for transfer to the treatment center determined by the court, unless the respondent waives the requirement for such transfer. Within fifteen days following an alternative placement, the department shall submit a report to the court stating the reasons for such placement and seeking court approval of the placement.
The definition of "gravely disabled" is in La. R.S. 28:2(10):
"Gravely disabled" means the condition of a person who is unable to provide for his own basic physical needs, such as essential food, clothing, medical care, and shelter, as a result of serious mental illness or substance abuse and is unable to survive safely in freedom or protect himself from serious harm; the term also includes incapacitation by alcohol, which means the condition of a person who, as a result of the use of alcohol, is unconscious or whose judgment is otherwise so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment.
In O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the Supreme Court stated that the "State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."
T.B.'s counsel notes that LSUHSC's sole witness was Dr. Fitz-Gerald, the court-appointed psychiatrist who is also T.B.'s treating psychiatrist at LSUHSC. He detailed Dr. Fitz-Gerald's reasons for finding that T.B. was gravely disabled and a danger to herself, namely:
 T.B. did not answer some questions or was uncooperative.
 T.B. was noncompliant with some medications.
 T.B. lived in Texas, so she could not follow her treatment or order compliance.
 T.B. had not shown that she could take care of her basic needs.
 T.B. showed she was a danger to herself because of the incident at the courthouse.
T.B.'s counsel contends that T.B.'s lack of cooperation with Dr. Fitz-Gerald is understandable inasmuch as it is Dr. Fitz-Gerald who objected to her discharge. He contends that, while initially not wanting to take the medications, T.B. was subsequently compliant and taking her medications.
T.B.'s counsel also argues that the state's rationale that because T.B. is a resident of Texas and hence Dr. Fitz-Gerald cannot ensure her outpatient treatment does not constitute a criteria or justification for forced inpatient treatment in this state.
*581 He also observes that there was no evidence presented that T.B. cannot take care of herself. Dr. Fitz-Gerald noted that she was healthy and that she was not dirty. She merely noted that T.B. wore a hat all the time. Her concern was simply that T.B. has not exhibited "executive functioning," i.e. she has not shown that she was spontaneously thinking about purchasing food and clothing, making sure she would have food in her house, and planning what she needed to do when she was released from the hospital. Dr. Fitz-Gerald was concerned about her inability to take care of her basic needs, and stated that "unless I know that she's going someplace safe[,] I would not want her just to go out on the streets of Shreveport and try to find her way around."
In short, T.B.'s counsel argues that the finding of grave disability is based more on speculation than hard evidence. He also notes that there is no independent evidence from Dr. Fitz-Gerald or otherwise that T.B. is a danger to herself. He notes that both the PEC and the CEC executed on the day of the courthouse incident and resulting from that incident stated that T.B. was not a danger to herself or others. Yet this incident is the basis for Dr. Fitz-Gerald's conclusions.
The state contends that T.B. suffers from depression and stated that Dr. Fitz-Gerald stated that she suffered from bipolar disorder. Actually, Dr. Fitz-Gerald acknowledged that she believed that T.B. "is perhaps bipolar and she is definitely suffering from psychosis today." It contends that the long pauses it took for T.B. to answer questions from counsel and the court were signs of her psychosis. At the hearing, Dr. Fitz-Gerald stated that sometimes psychotic patients exhibit these kinds of pauses because they are hearing and seeing things, but T.B. denied that this was the case.
The state also argues that Dr. Fitz-Gerald's conclusions that T.B. is delusional, paranoid and psychotic were based upon several weeks of treatment of T.B., not simply three interviews as T.B. claimed. Additionally, she had the family's information and information obtained by the staff. T.B. admitted at the hearing that she believed she was being denied her rights by the State of Texas and that the FBI was looking for her. Although the state details counterpoints against each of the issues raised by T.B., in summary, it contends that because of the actions of T.B., the conclusions of the psychiatrist and court should not be disturbed because they are reasonable considering T.B.'s behavior. This behavior includes T.B.'s actions that caused her to be brought to LSUHSC, her lack of cooperation for treatment, and her refusal to provide the information necessary to make an assessment that she should be released.
After careful review and consideration, we conclude that the trial court did not err in its judgment that T.B. is gravely disabled and poses a danger to herself. In addition to Dr. Fitz-Gerald's professional opinion, a critical factor in our conclusion is the fact that the trial judge had the benefit of personally observing T.B.'s demeanor while she testified. It is obvious from the transcript of this testimony that T.B. is suffering from some form of mental illness which requires treatment. For example, we note that T.B. could not remember how she arrived in Shreveport, and her refusal to answer how she knew she had been in Shreveport only one day when she could not remember how she arrived in this city was nonsensical. Although she gave a home address in Lone Star, Texas, the record indicates that this is not really her residence, but perhaps her uncle's address. Yet, none of T.B.'s relatives were present at the hearing to testify regarding *582 her residence, her behavior or her means of self-support. In short, counsel for T.B. was unable to present any evidence that would lead the trial court to believe that the information in the reports that indicated she was a threat to herself were false. Furthermore, we observe that the judgment of the trial court provides safeguards to ensure that T.B. is not unnecessarily confined to lengthy treatment without review, and any additional steps by the state are subject to court scrutiny.
For these reasons, the judgment of the trial court is affirmed.
AFFIRMED.