## (July 30, 1981)

■ THE PEOPLE OF THE STATE OF NEW YORK ex rel. MICHAEL J. BOUSQUET, on Behalf of ANONYMOUS, Appellant, v STEVEN KATZ, Respondent. — Order, Supreme Court, New York County (Hughes, J.), entered on September 9, 1980, dismissed as moot, without costs and without disbursements. Silverman, J., concurs in a memorandum in which Ross, J.P., concurs; Bloom, J., concurs in a separate memorandum; Markewich and Fein, JJ., dissent in a memorandum by Fein, J.

Silverman, J. (concurring). Whether the actions of the mental hospital and its physicians with respect to retaining petitioner as a patient were or were not strictly correct, there is nothing to indicate that the criticisms that are made by the dissent represent either a general or repetitive practice or policy of respondent rather than merely what happened with respect to this one patient, as to whom the case is clearly moot. There is, therefore, no need for judicial intervention to lay down some rule of law that may be applicable in other situations, or to make a general criticism of what happened in this case. Consideration of our function as an intermediate appellate court should make us chary of expressing opinions on cases where the particular case is moot. As an intermediate appellate court we do not settle the law of the State; our primary focus must thus be on the decision of the particular case before us. And when that particular case has become moot so has our role in that case.

Bloom, J. (concurring). Since the person on whose behalf this proceeding is brought is no longer under restraint by the medical director of Bellevue Psychiatric Hospital, I am in agreement that this habeas corpus proceeding is moot and should be dismissed (People ex rel. Harrison v Smith, 42 NY2d 995; People ex rel. Price v Warden, 37 NY2d 804; People ex rel. Andino v Schubin, 37 NY2d 751; People ex rel. Wilder v Markley, 26 NY2d 648). Nevertheless, I am constrained to indicate that the criticism of the authorities in retaining custody beyond the period permitted by law is proper and warranted.

Fein, J. (dissenting). This is an appeal from an order dismissing a writ of habeas corpus and directing remand to the custody of respondent medical director of Bellevue Psychiatric Hospital, more than seven weeks after relator's involuntary admission to the hospital. Relator was discharged from the hospital shortly after dismissal of his writ. I disagree with the majority that this issue was rendered moot by relator's discharge; I would reverse and sustain the writ. Article 9 of the Mental Hygiene Law is concerned with the hospitalization of the mentally ill. Such hospitalization is divided into two

basic categories, voluntary and involuntary admissions. The statute zealously seeks to protect the rights of patients. It makes available to them access to the mental health information service (§ 9.07). As a matter of policy, our law recognizes the desirability of voluntary patient status (§ 9.21), and encourages conversion of involuntary admissions to voluntary status whenever possible (§ 9.23). The status of a patient voluntarily admitted is reviewed at 12-month intervals, or more frequently where the voluntariness of retention is questioned (§ 9.25). A voluntary patient may apply for release on 72 hours' notice, during which interim the hospital director must either release the patient or apply for a court order authorizing retention on an involuntary basis (§ 9.13, subd [b]). Patients may be admitted on an involuntary basis upon timely independent certification (10 days prior to admission) by two examining physicians in support of the application for admission, confirmed by independent psychiatric examination at the admitting hospital (§ 9.27). The standard for such admission is: mental illness necessitating hospital care and treatment for the patient's own welfare, where the patient's judgment has been impaired to the extent that he does not understand his need for such care and treatment (§ 9.01). The hospital is required to notify, *inter alia,* the mental health information service and the nearest relative of an involuntarily admitted patient within five days of admission (§ 9.29). An involuntary patient or anyone acting on his behalf has a right to a hearing in court to review his status, on five days' notice, at any time during his first 60 days of retention (§ 9.31). He may not be retained for more than 60 days without judicial approval. Any extention sought must be on five days' notice to the patient of his right to a hearing. Involuntary retention can then be judicially approved for successive periods of six months, one year and two years (§ 9.33). Relator was admitted under section 9.39, a subcategory of involuntary admissions entitled "Emergency admissions for immediate observation, care, and treatment". The criterion for such emergency admission is that the patient's alleged mental illness is "likely to result in serious harm to himself or others". This criterion is further defined as: "(1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." Such emergency admissions can be made on the application of a director of community services (or his designee) who has personally examined the patient and certified the need for immediate hospitalization, provided that the need is confirmed by examination by a hospital staff physician prior to admission and by a staff psychiatrist within 72 hours (§ 9.37). Under section 9.39, a patient may be involuntarily admitted on an emergency basis without the certificate of a director of community services (or his designee), provided that the substantial risk of physical harm to the patient or others is certified by an examining physician at the hospital and confirmed by a staff psychiatrist within 48 hours. If such condition is not confirmed within 48 hours by independent examination by a staff psychiatrist, the patient must be released. The patient is entitled to a court hearing within five days if requested by himself, a relative, a friend or the mental health information service. A patient may not be retained in this emergency status for more than 15 days. Even a court order resulting from a hearing requested by or on behalf of the patient cannot direct his retention beyond 15 days, the reach of such order being statutorily confined to a determination only that there is reasonable cause to retain the patient on an emergency basis up to 15 days. The patient must be released upon expiration of that period unless steps have been taken to formalize his status as an involuntary patient, with all the rights consonant

therewith. On July 24, 1980, barely three weeks after his release from Bellevue, the relator, in his mid-thirties, was discovered by his father, lying in the hallway of an apartment building. Relator was removed to Bellevue with the assistance of the police, whose intervention in such cases is also dependent on the criterion that the patient's condition "is likely to result in serious harm to himself or others" (§ 9.41). The writ should have been sustained for a number of reasons. In the first place, there is no indication that the examination by the admitting physician or that of the staff psychiatrist during the next 48 hours revealed the crucial criterion of substantial risk of harm to the patient or others. The testimony of the staff psychiatrist, Dr. Oei, is enlightening in this respect: "Q I refer you in the chart to the record of emergency admission and to the forty-eight hour confirmation by you. Could you turn to that page in the chart? A Yes. Q Now, this is a confirmation which you filled out within forty-eight hours of the time that [relator] came into the hospital, is that correct? A That's right. Q Could you read to the Court what the question is, number five, and what your response was? A Number five, 'Does the patient show a tendency to injure himself, to injure others?' I only wrote down, 'The patient is paranoid. He believed the police were after him with tear gas and was withdrawn.' Q Did you write anything in number five? A I didn't write anything in number five. Q In number five is the question where they are asking whether he is dangerous to himself or others? A That's right. Q So at that time I would take it that you did not believe he was dangerous to himself or others? A That's correct. But he is still very sick, though." By "very sick", Dr. Oei was no doubt referring to relator's recent prior hospitalization at Bellevue which had been precipitated by relator's having stripped naked on a subway train while en route to visit his mother's grave. Relator had been discharged on July 3, 1980 on medication, but he apparently failed to take his medicine. It must be emphasized that while the standard for emergency retention applies only during the first 15 days, at *no* point in the eight weeks during which relator was confined at Bellevue was there ever a finding that he represented a threat of harm to himself or others. Dr. Oei testified only that the nurses in the ward had reported complaints about relator from other patients: "Q Doctor, I refer you to your own continuation record note of September 5, if you could turn to that, please. A Yes. Q Now, in the last sentence of that note do you state there that he has not exhibited any behavior, any dangerous behavior to himself or others? A That's exactly correct, but as soon as I wrote it down the weekend he solicited sex with both men and women to the point that people complained about it. Q What do you mean 'he solicited sex,' what did he do? A Well, I just read in the nursing staff report that several patients complained, both men and women, that [relator] was bothering them, asking for sex. Q So you don't have any idea what happened? A I was not here on weekend, I only rely on the report of the nurses now. *** Q *** So you don't know if this behavior which he exhibited on the ward was dangerous behavior? A I am not saying he is dangerous. He never showed any tendency to assault anyone. He does bother them. *** Q What was the reason he was brought to the hospital? A He was found lying in the hallway of his apartment building. Q Would you say that is necessarily dangerous behavior? A That necessarily is not necessarily dangerous, but it is a question in people's minds about his sanity." In failing to meet the statutory criterion for retention on an emergency basis beyond 48 hours, i.e., a demonstration of at least the risk of violent behavior, the testimony of Dr. Oei speaks for itself. Not only was it improper not to discharge relator within 48 hours due to lack of showing of substantial risk of harm to himself or others, but the hospital was also remiss in retaining him beyond 15 days without taking steps either to formalize his involuntary admission to the hosptal (§ 9.39, subd [b]) or to convert his status

to voluntary admission (§ 9.23). Dr. Oei testified that on August 8, the 15th day of his hospitalization; relator acknowledged that he was sick and wanted to remain in the hospital until he was sufficiently recovered to leave and enter a graduate school program. But the statute requires an adult patient seeking admission in voluntary status to make "written application therefor" (§ 9.13, subd [a]). Nor can this have been considered an "informal admission" (§ 9.15), which would dispense with the formality of a written application, because such status can be terminated at the patient's option any time he wants to leave. Subsequent events clearly showed relator was not free to leave. Even accepting respondent's argument that relator validly converted his status to "voluntary" on August 8, respondent is hard pressed to show why he opposed relator's 72-hour request for discharge — the right of any voluntary patient — just 20 days later, on August 28. Having illegally retained relator beyond 48 hours without a showing of risk of substantial harm to himself or others, and beyond 15 days without formalizing his involuntary status, hospital officials did not get around to certifying relator's involuntary status until September 4, the 43rd day of his hospitalization, and then only in response to relator's written request for discharge four business days earlier, on August 28 (in itself a violation of the requirement to act within 72 hours, under § 9.13, subd [b]). In his certification of mental illness, dated September 3, Dr. Oei diagnosed relator's condition as "Chronic Undifferentiated", and described the patient as "Untidy. Dishevelled. Uncooperative. Does not answer most questions. Speech irrelevant. Sensorium clear. Poor insight and judgment." Dr. Oei elaborated on this in testimony that relator's unco-operativeness took the form of refusing to talk with the doctor unless the topic of conversation could include baseball. Dr. Delgado's confirming certification reported that relator had become "increasingly withdrawn and bizarre" since his previous discharge, that on admission he "was found to have paranoid delusions concerning the police being after him with tear gas, and to have loosened associations." Dr. Delgado gave practically no assessment of relator's condition at the time of this certification, other than the observation that relator had not responded appreciably to medication and the conclusion that "[a]t present he requires further inpatient treatment." Even assuming for the moment that these assessments, rendered just 13 days before relator's discharge from the hospital, met the involuntary status test of evidence of mental illness, necessity of hospital care and treatment for the patient's own welfare, and impairment of judgment to the extent that the patient does not understand his need for such care and treatment, they do not right the wrongs of relator's illegal confinement up to that time. Respondent is relegated to arguing successively, in effect, that (1) relator was admitted on an emergency basis (although no emergency was ever certified); (2) he voluntarily extended his stay 15 days later, on the termination date for emergency retention (even though this extension was never put into writing as required by statute); (3) that just 26 days later relator had suddenly lost his capacity for appreciating his need for hospitalization and treatment, thus forfeiting his voluntary status and returning to involuntary status; and (4) he recovered again so quickly that he was discharged just two weeks later. By contrast, relator's testimony at the hearing presented an explanation, albeit not entirely palatable, for his uncommunicative behavior vis-à-vis Dr. Oei, the treating physician at the hospital. Relator indicated that if discharged he would not take the medication prescribed for him, although he might be willing to see a psychiatrist on an out-patient basis. Relator discussed his income from disability benefits, and his desire and ability to take up temporary residence in a hotel, adding that he was on the waiting list for a halfway house. On the whole, his testimony might be described as sometimes disjointed, sometimes arrogant and sometimes clownish, but generally lucid. It

certainly did not support the certifying doctors' conclusion of mental illness warranting involuntary hospitalization. "Mental illness" must be identified with reasonable accuracy before it can serve as a basis for an involuntary custodial confinement *(O'Connor v Donaldson,* 422 US 563, 575). On the question of mootness, relator's situation clearly met the two-pronged exception of (1) governmental action too short in duration to be fully litigated prior to its cessation or expiration; and (2) reasonable expectation that he would be subjected to the same action again *(Weinstein v Bradford,* 423 US 147, 149), known as the doctrine of "capable of repetition, yet evading review" *(Southern Pacific Term. Co. v ICC,* 219 US 498). Relator is an educated man with a teaching background who has indicated that he would like to further his education and prospects for employment. He claims the stigma of mental illness had made it difficult for him to get decent jobs, thus relegating him to part-time work as sales clerk, coding clerk, survey auditor, etc. While the law may presume that a condition of mental illness, once present, will continue to exist *(Parker v Parker,* 66 AD2d 328), this most recent illegal confinement for nearly eight weeks is of such public importance that it cannot be minimized *(Vitek v Jones,* 445 US 480, 492; *Addington v Texas,* 441 US 418, 425-426). It should not be permitted to stand permanently upon the record as justified or warranted *(Matter of Coates,* 8 AD2d 444, 452, affd 9 NY2d 242). Moreover, the pattern of action by the hospital in this case suggests that similarly situated mental patients may be subjected to the same disregard of rights. Involuntary confinement is the exercise of awesome power. The burden is on him who confines another, even for "his own good", to justify the need for such restraint. Otherwise liberty is at jeopardy. To this end the statute carefully articulates the duties of the hospital with respect to the needs and rights of patients. Although not discussed in the briefs, it appears that despite the clear requirement of section 9.39 of the Mental Hygiene Law for immediate notification to mental health information service on admission, MHIS was not notified of relator's admission and status for at least one month thereafter. This defeats the very purpose for which MHIS exists. It is possible — indeed, highly probable — that, had MHIS been notified when it should have been, its immediate intervention could have avoided the sequence of errors leading to the writ. Compare *People v Durant* (56 AD2d 471), the subsequent amendment to CPL 330.20 (L 1977, ch 780), and the memorandum of the Office of Court Administration in support of the amendment (2 McKinney's 1977 Session Laws of New York 2633-2634). This failure to carry out statutory duties also demonstrates a practice which may well be repeated. We should not abjure our responsibilities to adjudicate and preserve the rights of those whose cases we review by taking refuge in the assertion that the case is moot and that we are an intermediate appellate court. In the face of the demonstrated failure of the hospital to comply with the statute, the issue is not moot. I would reverse, on the law and the facts, and sustain the writ of habeas corpus.