**In re Yvonne NADEAU a.k.a. Johnson, a.k.a. Yvette Noell Dossier, a.k.a. Yvonne Lynn Hawkes.**

No. C5–85–1373.

Court of Appeals of Minnesota.

Oct. 22, 1985.

Peter M. Rosene, Thomas R. Haugrud, St. Paul, for appellant Nadeau.

Thomas Foley, Ramsey Co. Atty., Brad A. Johnson, Asst. Ramsey Co. Atty., St. Paul, for respondent.

Heard, considered and decided by POPOVICH, C.J., and WOZNIAK and HUSPENI, JJ.

### OPINION

HUSPENI, Judge.

Nadeau appeals from a July 18, 1985 judgment of commitment to Anoka State Hospital. We reverse.

### FACTS

Nadeau, a 32-year-old woman, was released from Anoka State Hospital in February 1984. She lived at Safe House, a residential halfway facility, until April 6, 1984. Eugene Poppler, director of Safe House,

testified that Nadeau was to contact a psychiatrist at the University Hospitals for outpatient therapy and find permanent housing. She did neither.

In March 1984, Nadeau injured her knee in a fall. She refused medical attention, even though the leg swelled and its condition concerned Safe House personnel.

After Nadeau left Safe House, she returned for overnight shelter at least thirty times during the next year or so, particularly during the winter months. On June 29, 1985, Nadeau was taken to Safe House by police for help due to the condition of her knee. Safe House personnel took Nadeau to the hospital, but she refused all treatment. Four days later, Nadeau was unable to leave a public bus due to pain and difficulty with her knee. Paramedics took her to Safe House and she was again taken to the hospital. Nadeau demanded that the hospital provide her with a wheelchair and wrap her knee, but she refused further treatment on religious grounds. She was admitted to the hospital and a petition for commitment was filed July 8.

Physician Anna Jaker testified that the knee should be immobilized and anti-inflammatory medication was recommended to ease Nadeau's pain. A consultation with the orthopedic department indicated that no long-term problem was foreseen as a result of the knee injury.

Jaker has four years of experience with psychiatric patients at Willmar State Hospital and now works at St. Paul Ramsey Medical Center. She described Nadeau's delusions that she would get free railroad passage to Washington, D.C. to sing and pray for the President. She concluded Nadeau was not dangerous to others. Although Nadeau may be "a nuisance to others" because of her religious beliefs, Jaker found that Nadeau was basically quiet and withdrawn and Jaker was unaware of any violent ideas. Nadeau was not malnourished and was appropriately dressed. She told Jaker that she had rented a room in which to recuperate after leaving the hospital, although Jaker could not confirm this.

Nadeau told hospital personnel and the trial court that she intended to leave immediately for her grandparents' farm in Bemidji. Jeffrey Nadeau, appellant's brother, testified that the farm was abandoned, had no utility service, and was not habitable. Nadeau also claimed she could live with her mother, who was then staying at the Grand Hotel.

Several witnesses described Nadeau's belief that she was "spiritually" married in 1982 or 1983 to Steven Johnson. A restraining order prevents all contact with Johnson, but Nadeau insisted that they were still "married," they had a "spirit child" and she communicated "spiritually" with him. There was no evidence that Nadeau had violated the restraining order.

Court-appointed examiner Daniel Larson concluded that Nadeau was a mentally ill person, suffering from paranoid schizophrenia. She suffered from paranoia, held grandiose religious beliefs, refused all medications, and was evasive and suspicious. Larson testified that Nadeau posed no danger to others, but he was concerned she may be unable to care for herself if released from the hospital. He recommended commitment to Anoka State Hospital.

The second examiner, appointed at the request of appellant, was psychologist Donald Anderson. Anderson had also examined Nadeau before her prior admission to Anoka State Hospital. Anderson concluded that Nadeau suffered from a major psychiatric disorder, specifically paranoid schizophrenia. Although Nadeau was not as deteriorated as other patients with similar diagnosis often seen by Anderson, he found that Nadeau's systematic paranoid delusions involving her "spiritual marriage" were still firmly in place two years after his initial examination. Anderson told the court that Nadeau required a sheltered environment, which Anoka State Hospital could provide.

Nadeau testified on her own behalf that she was going to live with her mother and son on the farm in Bemidji. The record indicated that the son was in the custody of his father in California. Since Nadeau

wanted to leave right away, she asked the trial court to dismiss the petition for commitment.

The trial court found that Nadeau suffered from chronic paranoid schizophrenia, characterized by prominent grandiose paranoid delusions. The court also found that Nadeau failed to provide for her medical needs and was unable to provide for her own care, and she had poor contact with reality, impaired judgment, and minimal insight into her condition. The court rejected alternative dispositions, noting Nadeau's resistance to voluntary treatment, and ordered her committed to Anoka State Hospital. On appeal, Nadeau argues that she was not shown to be mentally ill and that, as a result, commitment was inappropriate.

## ISSUE

Did the trial court properly commit Nadeau to Anoka State Hospital as a mentally ill person?

## ANALYSIS

■ If the trial court finds, by clear and convincing evidence, that a proposed patient is mentally ill and there is no suitable alternative to commitment, the court must commit the patient to the least restrictive treatment facility which can meet the needs of the patient. Minn.Stat. § 253B.09, subd. 1 (1984). We will not disturb the findings of the trial court unless clearly erroneous. Minn.R.Civ.P. 52.01.

Minn.Stat. § 253B.02, subd. 13 (1984) defines a "mentally ill person" in relevant part as:

[A]ny person who has * * * a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (a) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (b) poses a substantial likelihood of physical harm to himself or others as demonstrated by (i) a recent attempt or threat to physically harm himself or others, or (ii) a failure to provide necessary food, clothing, shelter

or medical care for himself, as a result of the impairment.

Minn.Stat. § 253B.02, subd. 13 (1984).

■ From the examiners' testimony, the trial court reasonably could find that Nadeau suffers from a substantial psychiatric disorder which impairs her judgment and behavior and which is manifested by disturbed behavior and faulty perceptions. However, we conclude that there was insufficient evidence to support a finding that Nadeau posed a substantial likelihood of harm to herself or others. All witnesses agreed that Nadeau posed no danger to others. There was no evidence to indicate that Nadeau was a danger to herself. Quite to the contrary, she was appropriately dressed, was not malnourished, and had previously obtained shelter at Safe House. There was no evidence that the resources used by Nadeau in the past to meet her needs for food, clothing, shelter, and medical care will be unavailable to her in the future.

The trial court found that Nadeau "refuses to provide herself with medical care." However, the record reflects that Nadeau had demanded that the hospital provide her with a wheelchair and wrap her injured knee. These demands were consistent with hospital recommendations that the knee be immobilized. The medications which she refused were ordered only to relieve her pain. They were not required for treatment of her knee. Such refusal cannot be deemed to present a "substantial likelihood of physical harm" within the context of Minn.Stat. § 253B.02, subd. 13.

Commitment of an individual is authorized only if mental illness results in likely physical harm to the proposed patient or others. *Id.* "[T]here is still no constitutional basis for confining * * * persons involuntarily if they are dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). Nadeau has chosen a lifestyle which few would voluntarily choose. Her religious views cause her to refuse pain medication.

Notwithstanding these factors, we cannot conclude that she is a mentally ill person under the definition set forth in Minn.Stat. § 253B.02, subd. 13. The trial court's determination that she is a mentally ill person was clearly erroneous.

## DECISION

The evidence does not support a finding that appellant was a mentally ill person likely to suffer physical harm, and commitment was inappropriate.

Reversed.