In the Matter of Patrick HARVEGO.

No. C6–86–663.

Court of Appeals of Minnesota.

June 24, 1986.

Terry L. Hegna, St. Paul, for appellant.

Thomas Johnson, Hennepin Co. Atty., Glenn Boyce, Asst. Co. Atty., Minneapolis, for respondent.

Considered and decided by POPOVICH, C.J., and PARKER and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

Patrick Harvego seeks review of a January 28, 1986 judgment of commitment. We affirm.

### FACTS

Doyle Harvego, appellant's father, petitioned for commitment of his 17-year-old son as a mentally ill person. The father testified appellant had extensively used street drugs. The elder Harvego testified he visited his son when he was hospitalized pending a hearing on the petition for commitment. During the visit, appellant continually wrote "charges" he insisted his father should bring against police who took him into custody, and against hospital staff. Appellant repeatedly stared at his father, claiming he was "talking with his eyes." Later, appellant telephoned his father to ask for a rope to help him escape from the hospital, although appellant later claimed he had been joking.

Doyle Harvego described appellant's statement that someone had drugged his cigarettes, his claim that he could get a job at Dayton's as a hairdresser paying $10 to $15 per hour (although he had no license or experience in that field), and his insistence that his father take him to try out for the North Stars hockey team. Doyle Harvego testified his son could not care for himself and had no job, income, or place to stay. Appellant had not lived at the family home for over a month when he was first hospitalized.

Appellant's mother testified her son came home shortly before he was hospitalized, accompanied by friends who wanted to discuss appellant's drug use and other problems. Appellant talked strangely, could not follow a conversation, and refused to leave the house after the friends had gone. This conduct frightened appellant's mother, and she called the police. She testified appellant believed she had left him on Hennepin Avenue to get "rabies" from homosexuals. He claimed he would get a large sum of money when he "won" at the commitment hearing and would then send a limousine for his younger sister and

a truck for her things so she could live with him. Appellant claimed Mafia and drug figures were "after him" and said his mother was working with these people.

Psychiatric social worker Linda Reinhardt-Sondrall worked at the North Memorial Crisis Unit, where appellant was held. She described appellant's inappropriate giggling and smiling, his belief that Dayton's would hire him as a hairdresser, assertions that he could control people's minds, and claims that his juice and food were poisoned and that prescribed medications caused crystals to form in his head. Reinhardt-Sondrall agreed that appellant could not care for his own needs.

Appellant personally cross-examined Reinhardt-Sondrall and other witnesses, at his insistence. On cross-examination, Reinhardt-Sondrall described appellant's demands for a limousine to pick up a girl to whom appellant claimed he had proposed, by telephone, the previous night. Reinhardt-Sondrall knew of appellant's inquiry to the North Stars about trying out for the team. She testified that appellant saved food in plastic wrap as "evidence" of poisoning.

The court-appointed examiner, licensed consulting psychologist Paul Boerger, testified he had sufficient time to examine appellant and had access to appellant's medical records. Appellant also presented written "charges" to the examiner. Boerger testified appellant suffered from severe mental illness, which he described as schizophrenia of a paranoid type, secondary to chemical abuse. Boerger testified appellant had a substantial psychiatric disorder of thought, mood, perception, orientation, and memory, which impaired appellant's judgment, behavior, and his capacity to recognize reality and to reason.

The examiner was not specifically questioned whether appellant's mental illness had been manifested by grossly disturbed behavior or faulty perceptions or whether he posed a substantial likelihood of physical harm to himself or others. However, the examiner's filed report described examples of appellant's faulty perceptions and beliefs.

Appellant chose to testify on his own behalf. He confirmed that friends took him to his parents' house to discuss his mental illness and chemical dependency. He claimed to have been unconditionally released from Hennepin County Medical Center, but his father testified hospital authorities had arranged for a cab to take appellant to a halfway house. Appellant testified he went to Hennepin Avenue because he had "hung out around there" when he previously worked at Dayton's. Appellant testified he then decided to call his parents because his jacket would not zip, his nose was running, he was cold, and homosexuals wanted to take him to a hotel.

The trial court found there was clear and convincing evidence appellant was mentally ill and unable to provide for himself, and stated on the record there was some evidence appellant may pose a danger to others. The trial court ordered appellant committed to the state hospital at Anoka.

### ISSUE

Are the trial court's commitment findings clearly erroneous?

### ANALYSIS

A judicial decision to commit and confine a person for treatment of mental illness must be supported by findings that conditions provided by statute have been proven by clear and convincing evidence. Minn. Stat. § 253B.09, subd. 1 (1984). These findings will not be disturbed on appeal unless they are clearly erroneous, and "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Minn.R.Civ.P. 52.01.

The Minnesota Commitment Act of 1982 establishes four conditions to govern the decision whether judicial confinement is lawful:

1. The proposed patient has a "substantial psychiatric disorder." Minn.Stat. § 253B.02, subd. 13 (1984); *see id.* § 253B.09, subd. 1.

2. The proposed patient's disorder is "manifested" by "instances" of grossly disturbed behavior or faulty perceptions. Minn.Stat. § 253B.02, subd. 13.

3. The disorder poses a substantial likelihood of harm to the proposed patient or others. *Id.*

4. All "reasonable alternative dispositions" are unsuitable. *Id.* § 253B.09, subd. 1.

This appeal primarily challenges the sufficiency of evidence on the third statutory standard. Judicial confinement of appellant can occur only if his disorder

poses a substantial likelihood of physical harm to himself or others as demonstrated by (i) a recent attempt or threat to physically harm himself or others, or (ii) a failure to provide necessary food, clothing, shelter or medical care for himself, as a result of the impairment.

Minn. Stat. § 253B.02, subd. 13 (1984). The statute enacts the view of the United States Supreme Court that there is "no constitutional basis for confining [mentally ill] persons involuntarily if they are dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975); *see In re Nadeau*, 375 N.W.2d 85 (Minn.Ct.App.1985) (judicial commitment reversed where "no evidence" indicated patient is dangerous to self and all witnesses agreed she is not dangerous to others).

Here the trial court found:

Respondent's recent conduct resulting from mental illness poses a substantial likelihood of physical harm as shown by an inability to provide for basic needs and his uncooperative and irrational behavior causing fear of his mother and sister, his belief that his mother wanted him to get AIDS.

The court did not find whether these facts were proven by clear and convincing evidence.

It was shown that appellant was not employed, had no other income, and had no place to live. His parents found him unmanageable at home because of his drug use and his disregard for household rules. Two days before he was hospitalized he was asked to leave the quarters where he had stayed since leaving the family home. It was acknowledged that appellant had always kept clean and dressed nicely, and at home he had eaten regularly. His father thought appellant's illness had worsened during recent months and he feared that his son would buy drugs rather than food if he had any funds available to him. The evidence supports an observation that appellant would not find it possible to keep a job or to provide for housing. He opposes treatment for a worsening condition. A psychiatric social worker believes he cannot care for his own needs.

Appellant has not harmed others. However, he does not respond rationally in conversation, and his mother and sister are afraid of dealing with him.

Undeniably, the evidence here involves conduct reflecting an adjustment problem that may occur without mental illness. In addition, we are concerned where the record does not show a thorough inquiry on the danger issue, a topic with constitutional implications. Still, it is evident that appellant's conduct as well as his conflicts with his family are enlarged if not prompted by his illness. It is evident his health is deteriorating. The trial court was not compelled to delay action until irreparable physical harm was suffered, so long as the danger of appellant's condition had already become evident. *In re Anderson*, 367 N.W.2d 107, 109 (Minn.Ct.App.1985).

We conclude that the danger that appellant may physically harm himself has been sufficiently shown, even though we have kept in mind the need for clear and convincing evidence of this fact. We are satisfied as well that the evidence shows the other conditions supporting a judicial commitment decision have been met.

### DECISION

Confinement for treatment of mental illness of appellant is justified by the facts found by the trial court, and the findings are adequately supported by the evidence.

Affirmed.