
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | |
| | ) | No. 36654-5-III |
| K.M. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — K.M. appeals a 180-day extension of her involuntary commitment to Western State Hospital (WSH), ordered in January 2018. Because substantial evidence supports the trial court's finding of grave disability and K.M. enjoyed no right to be placed in a least restrictive alternative with her daughter, we affirm.

FACTS AND PROCEDURAL BACKGROUND

K.M. is a 64-year-old woman who suffers from schizoaffective disorder, bipolar disorder, and a history of amphetamine use disorder. In July 2017 a court commissioner found K.M. to be gravely disabled and granted a motion committing her for 180 days of intensive inpatient treatment. This followed a commitment for 90 days of involuntary treatment at WSH—then K.M.'s seventh admission to that institution.

On January 5, 2018—165 days into her 180-day commitment—two WSH professionals, Dr. Peter Bingcang, M.D. (the examining physician) and Kimberly

Chadwick, Psy.D. (the examining mental health professional) petitioned for another 180 days of involuntary treatment. They stated in the petition that K.M. was ready for a less restrictive alternative placement when an appropriate one became available.

In their supporting declaration, the examiners testified that K.M. had showed some improvement between July and October 2017, gaining consistency in her group attendance and absorbing and displaying some skills for calming her emotions and understanding the needs of others. In completing a discharge evaluation in November 2017, she was able to stay focused, and asked to be discharged to live with her daughter.

During the latter part of November and through December, however, the examiners testified that K.M.'s behavior had deteriorated, coincident with her being allowed unsupervised leave with her family. They characterized her interactions with her family as disrupting her treatment, stating that "all attempts to set limits and provide structure have resulted in further upset." Sealed Clerk's Papers (SCP) at 29. In December, K.M. began telling staff that several members of her family had died, committed suicide, gone missing, or were otherwise in danger. Even when her treatment team demonstrated that her family members were alive and safe, K.M. remained agitated and worried about them.

At the same time, K.M. accused family members of using her debit card while she was on unsupervised leave with them, which led to a report to Adult Protective Services

and cancellation of her family leave privilege. Dr. Chadwick noted there were problems

with K.M.'s family, but

> it was not clear how much [was] her disjointed thinking and how much is
> confusion from the family. . . . Given that staff members are not privy to
> these conversations, it is not known how much is true and how much is
> confused by [K.M]. Previous documentation from WSH notes that this is
> an enmeshed family system with extensive drug addiction issues, and
> similar reports exist in those previous records.

SCP at 31.

The examiners' declaration explained their reasoning in stating that K.M. was

ready for a less restrictive alternative placement "when an appropriate one is available":

> [K.M.] had stabilized to the point of being ready for discharge and it is
> expected that she will be able to achieve that stability again with additional
> structured supports. That process is proceeding; however, she will need a
> structured living arrangement that will provide oversight for medications
> and medical conditions upon discharge to maintain her status. She has a
> payee for her social security funds and WSH is exploring a fiduciary for her
> [Veterans Affairs (VA)] funds to provide for protection against
> exploitation.

SCP at 33.

At the hearing on the petition, a superior court commissioner heard from Dr.

Chadwick, K.M., and K.M.'s daughter, Theresa Vogel.

Dr. Chadwick testified to two sets of concerns about K.M. One was an increase

over the prior month and a half in K.M.'s emotional instability, exhibited by "[m]ultiple

episodes where she gets very angry, very upset." SCP at 56. The doctor characterized

"[a] great deal of this" as "ha[ving] to do with family issues that she reports." *Id.* The

3

second concern was that K.M. "is starting to show some delusional beliefs again." *Id.*

Dr. Chadwick said that K.M. had been attending after-treatment, but her attendance had

dropped significantly because she was spending most of her time on the pay phone with

her family.

Addressing K.M.'s cognitive and volitional control, Dr. Chadwick said that K.M.

was having daily episodes of yelling at staff, escalating to threatening staff. She

described K.M. as having trouble with judgment. K.M. had given her debit card to her

family, but then said her family spent the money without her permission. She would loan

cigarettes and money to her peers and would then "accuse[ ] them of stealing" the money

and report that she had just told her peers to "hold" them for her. SCP at 58-59.

Asked whether K.M. would be able to meet her basic health and safety needs if

released that day, Dr. Chadwick said:

> I believe that she would place herself at risk. She would be—her request
> has been to go to her family—we believe her family is not a safe placement
> for her; that she would need a structured living arrangement that would
> provide oversight for her medications and her medical—physical and
> medical conditions, and that she would need a payee to protect her funds
> and protect her from financial exploitation.

SCP at 59. Dr. Chadwick explained that a structured placement such as an adult family

home was necessary because of K.M.'s medical and mental health problems. She

described K.M. as requiring staff help for daily life activities such as showering, due to

her seizures and joint problems.

Addressing whether K.M. would seek out and follow through on mental health care if released, Dr. Chadwick testified that she did not believe that she would. As reasons for her belief, Dr. Chadwick stated:

> Her statements that she does not necessarily have a mental illness, that she minimizes the number of times she's been hospitalized, that she was homeless prior to this hospitalization, that she's displaying poor judgment, including not being able to spend or take care of her money which would put her back into a homeless situation which is what led to her current hospitalization.

SCP at 60.

Dr. Chadwick stated that K.M.'s treatment team was "of the strong opinion that discharging to her family or being around her family is not a safe place for her at this time. There is at least one open Adult Protective Service investigation that we know of, regarding financial expectation [sic].[1] And we would be concerned about that. . . . We would like to work with her to obtain an adult family home level of care." SCP at 60-61. Dr. Chadwick testified that while no such placement was available at the time of the hearing, K.M.'s team was taking the steps necessary to get her one. Dr. Chadwick expressed the opinion that K.M. was gravely disabled by her mental illness and recommended that she stay in WSH until an appropriate adult family home placement could be found.

---

[1] Possibly a mistranscription of "exploitation." See related testimony at SCP at 59.

K.M. testified on her own behalf, in opposition to the proposed continued commitment. She testified that she had established a third party payee for her Social Security income, so it would not go to her family. She said she had a mental health counselor she could see twice a week and would continue to take her medications if released to live with her daughter. She disputed Dr. Chadwick's testimony that she could not attend to her health needs, insisting that she was capable of caring for herself, including showering.

The commissioner also heard from K.M.'s daughter, Theresa Vogel. Ms. Vogel said she wanted her mother to live with her and that if the courts had doubts, she could "have hospice come in if they're concerned about me or whatever." SCP at 68. Ms. Vogel testified that she was willing to be uninvolved with K.M.'s finances and have a third-party payee for K.M.'s [Supplemental Security Income] and VA monthly income. She testified that she had no problem getting her mother to take her medication and had purchased a minivan to address the fact that K.M. uses a walker and may need a wheelchair at some point.

Under cross-examination by the State, Ms. Vogel admitted that her mother had lived with her "[y]ears ago" and had ended up back in WSH after Ms. Vogel was arrested on warrants. SCP at 70. Ms. Vogel had been sent to Spokane for drug treatment and explained that "when I was there, my mom got kicked out . . . 'cause I guess my roommate was incarcerated or something, and so everybody had to leave the house." *Id.*

6

In her direct examination, Ms. Vogel had acknowledged that one time while her mother was in her care, Ms. Vogel had gone on a three week vacation, leaving her son responsible for picking up K.M.'s medication. While left in Ms. Vogel's son's care, K.M.'s medication was incorrectly and incompletely provided.

At the conclusion of the hearing, the commissioner found K.M. to be gravely disabled and announced, "I will grant the petitioner's request for a less restrictive alternative but I'm also, in the order I have stated that the respondent requires a very structured, highly monitored placement such as an adult family home, and I have also put in this order that the respondent's family is not a viable placement option." SCP at 73. Written findings and conclusions were entered the same day.

K.M. filed a motion for revision of the commissioner's decision, challenging the sufficiency of the evidence to support the finding she was gravely disabled and the commissioner's finding that her family was not a viable placement. She argued that because she had family willing and able to care for her, there was no basis for involuntary commitment. The trial court denied the motion for revision, adopting the commissioner's findings of fact and conclusions of law. K.M. appeals. Division Two administratively transferred the appeal to Division Three.

## ANALYSIS

K.M.'s appeal renews the arguments made in seeking revision: she challenges the sufficiency of the evidence to support the finding that she was gravely disabled and

argues that given her daughter's willingness to house and care for her, there was no statutory or constitutional basis for involuntary commitment.

"[I]nvoluntary commitment for mental disorders is a significant deprivation of liberty which the State cannot accomplish without due process of law." *In re Det. of LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986) (citing *Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984); *In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982)). Although the State has a legitimate interest under its parens patriae powers "in providing care to those who are unable to care for themselves . . . mental illness alone is not a constitutionally adequate basis for involuntary commitment." *LaBelle*, 107 Wn.2d at 201. Accordingly, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975).

Under chapter 71.05 RCW, persons may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled. *LaBelle*, 107 Wn.2d at 201-02 (citing former RCW 71.05.020(1), .020(3), .150, .240, .280, .320 (1986)). In this case, K.M. was involuntarily committed because she is gravely disabled. Former RCW 71.05.020(17), (LAWS OF 2016, ch. 255, § 1) provides a twofold definition of "gravely disabled" as meaning

a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his [or her] essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

*LaBelle* at 202 (footnote omitted). Either alternative may serve as the basis for involuntary commitment. *Id.*

When the State proceeds under former RCW 71.05.020(1)(b), the basis for K.M.'s commitment,

it is particularly important that the evidence provide a factual basis for concluding that an individual "manifests severe [mental] deterioration in routine functioning". Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be essential to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

Furthermore, the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to his or her need for treatment. Implicit in the definition of gravely disabled under RCW 71.05.020(1)(b) is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety."

*Id.* at 208 (some emphasis omitted) (alteration in original).

9

For a 90-day or 180-day involuntary commitment proceeding, grave disability must be shown by clear, cogent, and convincing evidence, meaning that the ultimate fact in issue is shown to be "highly probable." *LaBelle*, 107 Wn.2d at 209; RCW 71.05.310; *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992). This court "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209. Even when reviewing for this heightened burden of proof, we defer to the trial court's determination of the weight of the evidence and credibility of witnesses. *Mueller v. Wells*, 185 Wn.2d 1, 16, 367 P.3d 580 (2016).

The State relied in this case on the testimony of Dr. Chadwick, a licensed clinical psychologist, who expressed her opinion that K.M. was gravely disabled and explained the reasons for her opinion. Her testimony was based on her personal observations and interviews with K.M., psychological tests, discussions with staff members at the hospital, evidence from 165 days of K.M.'s treatment, and review of her medical records.

The State presented evidence that K.M. suffers from schizophrenia, bipolar disorder, and history of amphetamine use disorder, and exhibits delusions, paranoia, mood lability, and poor judgment. Dr. Chadwick testified that at the time of the hearing, following a month and a half of deteriorating emotional stability and increasing delusions, K.M. had minimal cognitive and volitional control, resulting in daily episodes

10

of yelling at staff, escalating to threats and veiled threats. Dr. Chadwick expressed her view that K.M. was unable to meet her basic health and safety needs and, if released that day, would put herself at risk. She did not believe K.M. would seek out and follow through on mental health care, and explained the reasons for her belief. The declaration in support of the State's petition provided a history of K.M.'s repeated rehospitalizations after being released into the community, some of which involved K.M. becoming homeless after being placed with family members.

Our Supreme Court has explained that a purpose of the "gravely disabled" alternative for commitment provided by former RCW 71.05.020(1)(b) is to combat a "revolving door" syndrome "[b]y permitting intervention before a mentally ill person's condition reaches crisis proportions." *LaBelle*, 107 Wn.2d at 206. Former RCW 71.05.020(1)(b) enables the State to provide the "kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." *Id.*

The trial court's finding that K.M. was "gravely disabled," under former RCW 71.05.020(17)(b) is supported by substantial evidence, which the trial court could reasonably find to be clear, cogent, and convincing.

In support of K.M.'s argument that she could not lawfully be involuntarily committed when her daughter was prepared to house and care for her, she points to the United States Supreme Court's holding in *O'Connor* that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in

11

freedom by himself or with the help of willing and responsible family members or friends." 422 U.S. at 576. Notably, *O'Connor* deals with individuals who are "capable of surviving safely" if not committed, and with help, if needed, that is provided by "responsible" family members or friends. If substantial evidence supports a finding of grave disability, as it does in K.M.'s case, it follows that the individual is *not* capable of surviving safely if not committed.

The argument made by K.M. has already been rejected by this court. A 1994 decision holds that an individual whom the State seeks to involuntarily commit does not have a constitutional or statutory right to less restrictive alternative treatment. *In re Det. of J.S.*, 124 Wn.2d 689, 701, 880 P.2d 976 (1994). Evidence at the hearing supports the trial court's finding that Ms. Vogel's home was not a viable placement.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

12