IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>A.G.S. | No. 85401-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A trial court issued an order committing A.G.S. to involuntary treatment for 90 days under chapter 71.05 RCW after it determined he was "gravely disabled." A.G.S. argues the evidence of his mental disorder was not sufficiently recent and did not show a sufficiently severe deterioration in his functioning for him to be found "gravely disabled" under RCW 71.05.020(25). We disagree and affirm.

FACTS

While hiking the Pacific Crest Trail in 2017, A.G.S. had a "brief romantic fling" with another hiker, C.D.[1] After C.D. returned to her home in Virginia and A.G.S. to his in Florida, they remained in contact via text messages and a few phone calls. After two months, "things started to change," and C.D. "started getting a lot of messages" from A.G.S., many of which made her "really uncomfortable." She told him to stop contacting her, and she blocked his numbers.

---

[1] C.D. hiked the Pacific Crest Trail, which runs through California, Oregon, and Washington, for three-and-a-half months and met A.G.S. "a couple of weeks to a month" into the hike.

In 2018, C.D. moved to Seattle. A.G.S. continued to send her messages and told her he was in Washington. In 2020, after learning he had showed up at her workplace, she obtained an order restricting him from contacting her for a period of two years. In 2022, she obtained a permanent no-contact order (NCO) against him. A.G.S. was prosecuted multiple times for violating these orders.

In February 2022, A.G.S. returned to Florida, where he was treated for eight or nine weeks for bipolar disorder, anxiety, PTSD,[2] and alcohol abuse. By September of that year, A.G.S. was on medication and "doing fantastic," according to his mother. She testified that A.G.S. had been on his medications for "a good four months by that point," he was working, he was living and paying rent at his godfather's house, and he no longer spoke about C.D.

In December 2022, A.G.S. told his mother he was going to Colorado. In March 2023, while A.G.S. was living in his car in Snohomish County, he was arrested on a bench warrant for failing to appear for criminal proceedings relating to violation of an NCO and booked into the King County Jail. An officer told C.D. that A.G.S. had been talking about her a lot and said he was there to see her.

The court ordered a competency evaluation, which was conducted on April 10, 2023. The evaluation concluded A.G.S. was incompetent to stand trial and was diagnosed with unspecified schizophrenia spectrum disorder and other psychotic disorder. After a competency hearing, on April 12, 2023, the court found A.G.S. was not

---

[2] Posttraumatic stress disorder.

2

competent to stand trial, dismissed the charges against him without prejudice, and referred him for evaluation for possible commitment for involuntary treatment.

On April 17, Dr. Margaret Cashman, a psychiatrist at Harborview Medical Center, evaluated A.G.S. and concluded that he "continues to endorse delusional ideas which support his unwanted stalking behavior." That same day, the State filed a petition in King County Superior Court to detain A.G.S. for involuntary treatment for 90 days.

A three-day hearing on the petition began on May 15, 2023. C.D., A.G.S.'s mother, and Brian Hayden, a court evaluator employed by Fairfax Hospital, testified. In addition, the court heard testimony from records custodians for Harborview Medical Center and King County Jail.

The court found by clear, cogent, and convincing evidence that A.G.S. suffered from a mental health disorder. It found A.G.S. "is delusional [and] believes he is married to [C.D.] and has a child with her." It found A.G.S. is "showing severe deterioration in routine functioning, evidenced by repeated & escalating loss of cognitive and volitional control over his actions such that, outside the hospital setting, he would not receive care that is essential to his health and safety." It found A.G.S.'s mother's testimony established a baseline as of December 2022 compared to which "the court concludes that the Respondent has suffered a severe deterioration." The court further concluded that A.G.S. "will not receive the treatment outside of the hospital as his profound lack of understanding of the world around him," given his plan to visit C.D. despite her permanent NCO, "will lead to his immediate arrest."

The court found insufficient evidence to support the allegation that A.G.S. was "gravely disabled" as defined in RCW 71.05.020(25)(a), but concluded he was "gravely disabled" as defined in RCW 71.05.020(25)(b), and granted the State's petition. The court also found that an order authorizing a less restrictive alternative to involuntary treatment "is not appropriate . . . because he is not mentally stable." It ordered A.G.S. detained for inpatient treatment at Fairfax Hospital for 90 days. A.G.S. timely appeals the court's order.

## DISCUSSION

A.G.S. challenges the sufficiency of the State's evidence to show he was "gravely disabled" as defined in RCW 71.05.020(25)(b). He contends the evidence of his delusional beliefs was not sufficiently recent, and that the evidence did not show his delusional beliefs are "significant" or "severe." The State argues that the record contains sufficient evidence for the trial court to find by clear, cogent, and convincing evidence that A.G.S. was "gravely disabled."[3] We agree with the State.

Under chapter 71.05 RCW, an adult may be involuntarily committed to treat a behavioral health disorder. In re Det. of LaBelle, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986). After a person has been detained for evaluation and treatment, a mental health professional may, subject to limitations, file a petition in superior court for an additional

---

[3] While A.G.S. does not address mootness, the State notes that it is not arguing that the appeal is moot and requests that the court decide the issue on the merits. As there are collateral consequences that can flow from a commitment order for involuntary treatment, we accept the State's concession that the appeal is not moot.

period of commitment if, as relevant here, the adult is "gravely disabled." RCW 71.05.280(4). RCW 71.05.020(25)[4] defines "gravely disabled" in two alternative ways:

> (25) "Gravely disabled" means a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

The second definition, RCW 71.05.020(25)(b), "contains two requirements." LaBelle, 107 Wn.2d at 205. "The State must show not only that a person 'manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control', but also that he or she 'is not receiving such care as is essential for his or her health or safety.' " Id. at 205 (quoting former RCW 71.05.020(1)(b)). This definition incorporates the concept of decompensation, which refers to involuntarily committed adults who, once returned to the community, "drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.' " Id. at 206 (quoting MARY L. DURHAM & JOHN Q. LAFOND, THE EMPIRICAL CONSEQUENCES AND POLICY IMPLICATIONS OF BROADENING THE STATUTORY CRITERIA FOR CIVIL COMMITMENT, 3 YALE L. & POL'Y REV. 395, 410 (1985)). "By permitting intervention before a mentally ill person's condition reaches crisis proportions," this statutory definition of "gravely disabled" "enables the State to provide

---

[4] Both parties cite to the current statute, RCW 71.05.020(25) for the definition of "gravely disabled." At the time the trial court issued the order that is the subject of appeal, on May 17, 2023, this definition had identical language but was in a different subsection. LAWS OF 2023, ch. 425, § 20 (codified at RCW 71.05.020(24)).

the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." Id.

However, "[t]here is a danger that persons will be involuntarily committed under this standard solely because they are suffering from mental illness and may benefit from treatment." Id. at 207. "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely," and "there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975). "It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests." LaBelle, 107 Wn.2d at 208. "To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." Id.

The "burden of proof at 90-day or 180-day involuntary commitment proceedings is by clear, cogent and convincing evidence." Id. at 209 (citing RCW 71.05.310). Generally, where the trial court has weighed evidence, our review is "limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." LaBelle, 107 Wn.2d at 209. However, "where the State must prove its case by clear, cogent and convincing evidence, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence." Id. Instead, "the findings must be supported by substantial evidence in light of the 'highly probable' test."

Id. (quoting In re Interest of Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984) (the ultimate fact in issue must be shown by evidence to be highly probable)). "Accordingly, we will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." Id.

Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise. In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015). Unchallenged findings of fact are verities on appeal. In re Det. of L.S., 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

I.     Evidence of a recent decline in cognitive or volitional control

A.G.S. argues "there is a lack of evidence that [his delusional] beliefs manifested recently." He claims that, because C.D. testified that since 2017, A.G.S. believed C.D. was his wife and the mother of their daughter, the State's petition alleging his loss of cognitive or volitional control in 2023 was not recent.

Here, the trial court found that A.G.S.'s mother's testimony established "his baseline" in September and December of 2022: she testified A.G.S. was "taking his medication and he had a fantastic demeanor." The court found A.G.S. was "balanced and not angry" based on her testimony. It found, based on his mother's testimony, that A.G.S.'s thinking showed insight, as he quit a job as a river rafting guide "because of the partying influence." Further, the mother testified that A.G.S. had a new job, he was paying rent, he had empathy and was aware what he had put his family through. Most importantly, the evidence was that he "did not talk[ ] about [C.D.]." Thus, A.G.S.'s

7

mother's testimony shows that while A.G.S. had suffered similar delusions when he returned to Florida and was hospitalized in February 2022, by September and December 2022, he was not experiencing these delusions.

Against that evidentiary baseline, the court's unchallenged findings in the present case, which are verities on appeal, establish there is substantial evidence in the record to support the trial court's conclusion that A.G.S. recently suffered a loss of cognitive or volitional control. Based on testimony about A.G.S.'s records from the King County Jail, which noted that A.G.S. said he had a wife and daughter he could live with once he got out of jail, the court found that by March 2023, A.G.S. was "severely agitated and uncooperative" and believed "that [C.D.] is his wife and that he has a daughter with her." Hayden testified that A.G.S. had a behavioral health disorder because of his "continued endorsement of delusional beliefs, specifically related to the existence of a daughter, as well as his relationship with the individual whom the [NCO] is in place for." Despite C.D.'s permanent NCO, the court found A.G.S. believed C.D. would "embrace him in her life."

The record contains substantial evidence to support the court's unchallenged findings of fact that after December 2022, A.G.S. had suffered a recent, and repeated, loss of cognitive or volitional control.

II.    Evidence of a severe deterioration in functioning

A.G.S. also argues "his symptoms lack the severity required by RCW 71.05.020(25)(b)." He argues the evidence in his case, like the evidence regarding Trueblood, one of the petitioners in LaBelle, " 'tends only to prove that [he] was still

8

suffering from a mental disorder; it does not provide clear and convincing evidence of grave disability as a result of the mental disorder.' " Brief of Appellant at 18 (quoting LaBelle, 107 Wn.2d at 217-18). The State argues A.G.S.'s commitment is precisely what the Legislature intended: intervention before a grave disability reaches crisis proportions. We conclude the trial court's conclusion that A.G.S.'s delusions constituted a severe deterioration in his routine functioning is supported by substantial evidence.

In LaBelle, the State alleged that Trueblood was "gravely disabled" under the statutory definition set out in subsection (a). Id. at 216. The trial court found Trueblood "gravely disabled," but "without indicating which" definition was satisfied, (a) or (b). Id. at 217. The LaBelle court ruled that under the statutory definition in either subsection, the State's evidence was not sufficiently clear, cogent, and convincing because "there was very little evidence that Trueblood was in substantial risk of serious physical harm because of failure to provide for his essential human needs" and the State's doctor's recent observations suggested "Trueblood was cognitively oriented and intact as of the time of the hearing."[5] Id. Further, the court concluded that the social worker's testimony about Trueblood complaining about treatment and missing appointments, "while based on more recent observations, tends only to prove that Trueblood was still suffering from a mental disorder; it does not provide clear and convincing evidence of grave disability as a result of the mental disorder." Id. at 217-18.

---

[5] Separately, the court concluded the trial court's finding that Trueblood was "gravely disabled" under subsection (b) for the purposes of a 14-day commitment order was "amply" supported by a preponderance of the evidence, a lower standard than the clear, cogent, and convincing standard required for 90- and 180-day commitment orders. Id. at 214 (citing RCW 71.05.240) (preponderance standard).

A.G.S. compares his case to Trueblood's, but the record here is more similar to the record in another petitioner's case in LaBelle, Marshall. With regard to Marshall,[6] the LaBelle court concluded the State presented substantial evidence of grave disability under the definition[7] in subsection (b) because "[t]here is ample evidence in the record of severe deterioration of mental functioning as evidenced by significant impairment of cognitive control immediately prior to and during his stay in the hospital." Id. at 213. The court also concluded medication "is essential to Marshall's health and safety," "Marshall is unable to understand his need for treatment," and Marshall would decompensate if released. Id. Both A.G.S. and Marshall suffered from delusions, and medication was essential to controlling delusions caused by the illness. And A.G.S., like Marshall, was unable to make rational choices about his need to maintain treatment.

In the present case, A.G.S. does not dispute he suffers from a mental illness. The record also establishes that his condition has become more severe over time. His mother testified that he had previously been treated for bipolar disorder, anxiety, and PTSD. But by the time he arrived in Washington in 2023, A.G.S. had a working diagnosis of "schizoaffective disorder and delusional disorder," because of his "continued endorsement of delusional beliefs, specifically related to the existence of a

---

[6] LaBelle was a consolidated case involving four petitioners: LaBelle, Marshall, Richardson, and Trueblood. 107 Wn.2d at 199.

[7] The trial court had found Marshall "gravely disabled" under the definition from subsection (a). The State's doctor testified, "Marshall suffers from hallucinations, delusions, confusion and disorganization," and he would "decompensate rapidly upon release without treatment . . . because Marshall is opposed to medication." Id. at 211-12. The trial court found Marshall's "hostile and reactive behavior placed him in danger of serious physical harm" and "expressly chose not to rely upon [the State's doctor]'s opinion of grave disability under [(b)]." Id. at 212. Our Supreme Court reasoned that the lower court's reliance on the definition in subsection (a) was misplaced, because Marshall was not at risk of serious harm from his failure to provide for his essential needs, as that subsection of the statute requires. Id.

daughter, as well as his relationship with the individual whom the [NCO] is in place for." During Hayden's initial evaluation, A.G.S. reported he was "here for my wife and daughter. I want to go through the process . . . so that I can be the best dad." Hayden testified that each progress note at Fairfax Hospital indicated that A.G.S. remained delusional: A.G.S. "states [his] goal is to quote, 'satisfy the goals of my treatment so that I can be with my wife and daughter,' unquote. There is no evidence of a wife or daughter, so this is likely delusional."[8] The final progress note, made the day before Hayden testified, states that A.G.S. "remains delusional, convinced he is married to a woman and that he has a child."

Not only did A.G.S. exhibit delusional thinking regarding C.D. and a nonexistent daughter, while in jail, he told a psychiatrist that there were drugs in the jail food and he didn't want to eat it. He also told the doctor that while he was drawing, he was "channeling his daughter's art." The psychiatrist opined that A.G.S. was "showing signs of paranoia and other delusions." When asked a few days later about drug use, he again responded that there were drugs in the food. He further stated he "intuited" he had a daughter and discussed markings on the walls as his daughter's "expressions." Asked how he knew his daughter exists even though he had never met her or seen a photo of her, he said "I just know," and that the "hieroglyphics" on his wall were a "transcendence of genetics, inheritance, ancestral components" made into drawings.

While in jail, regarding hygiene, A.G.S. said he had no desire to shower and spent his time on his writings, which he did "mostly in the air" and which covered

---

[8] C.D. testified that "I've never been married, period," and "I've never had a child, ever."

11

"organizational analyses, key players and such, high profile individuals, and publicly traded companies." Presented with the option of medication to help calm his thoughts and discomfort around other people, he said, "[W]hy am I the problem, here? Just because other people are uncomfortable, doesn't mean I'm the issue," and stated that medication would "neutralize the substrata of [his] consciousness." The evaluator concluded that it seemed likely he had an underlying primary thought disorder versus amphetamine-induced psychosis.

At the hearing, Hayden testified that A.G.S. "is not medication stable at present" and "is not stabilized on the medication and continues to endorse delusions that put himself and others at risk." He testified to his concern that A.G.S. "will again decompensate, since he is not fully re-compensated." His testimony noted that A.G.S. had improved in the past with medication.

Substantial evidence showed that as recently as September and December of 2022, as a result of treatment, A.G.S. was not suffering from delusions. The record also showed that A.G.S.'s loss of control escalated prior to the commitment hearing because he had come to Washington to seek out C.D., and his delusions represented a severe deterioration in his routine functioning. He was neglecting his hygiene and displayed underlying thought disorders rather than drug-induced psychosis. Further, his diagnoses progressed from bipolar disorder, anxiety, and PTSD to the more severe schizoaffective disorder and delusional disorder. The record also showed medication is essential to A.G.S.'s health and that A.G.S. was unable to make a rational decision to continue receiving treatment.

12

Substantial evidence supported the court's conclusion that A.G.S. had a behavioral health disorder and met the definition of "gravely disabled" in RCW 71.05.020(25)(b). The record established that A.G.S. experienced severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his actions and, as he refused medication, was not receiving such care as was essential for his health or safety.

## CONCLUSION

The record contains substantial evidence of a clear, cogent, and convincing nature to support the trial court's findings that, in turn, support the conclusion that A.G.S. was "gravely disabled" as defined in RCW 71.05.020(25)(b).

Affirmed.

_Chung, J._

WE CONCUR:

_Díaz, J._

_Hazelrigg, ACJ_